The People of the State of Illinois on the relation of WILLIAM BARNES,

*v.*

ALEXANDER STARNE, Treasurer of the State of Illinois.

1.  STATUTES — *Of the evidence by which their validity may be ascertained — and herein, of referring to the journals of the general assembly for that purpose.* Were it not for the provision of our Constitution, which requires that all bills, before they can become laws, shall be read three several times in each house, and shall be passed by a vote of a majority of all the members elect, a bill signed by the speakers of the two houses, and approved by the governor, would be conclusive of its validity and binding force as a law.

2.  But this provision having been adopted, the means for its enforcement are implied. It is true, these means are negative, not positive, in their character; neither of the other co-ordinate branches of the government have authority to command its observance, yet the judicial and executive departments are not bound to enforce such bills as laws.

3.  They are *prima facie* binding, but when it appears from the journals that either of these constitutional requirements is wanting, the provisions of the bill will not be enforced.

4.  According to the theory of our legislation, when a bill has become a law, there must be record evidence of every material requirement, from its introduction until it becomes a law. And this evidence is found upon the journals of the two houses.

5.  And those journals may be referred to by the courts, for the purpose of overcoming the presumption of the validity of a printed act with all the forms of a law.

6.  APPROPRIATION ACT OF 1863 — *Did not become a law.* The bill purporting to be "an act to provide for the ordinary and contingent expenses of the government until the adjournment of the next regular session of the general assembly," signed by the speakers of the two houses, and approved by the governor on the 14th of February, 1863, is not a law, because it does not appear from the journal of the house of representatives, to have passed that body.

THIS was an application made to this court at Springfield, at the January Term, 1864, in the name of The People of the State of Illinois, on the relation of William Barnes, for a writ of *mandamus* against Alexander Starne, as treasurer of the State of Illinois, commanding him to countersign, register and

122    The People ex rel. Barnes v. Starne.    [April T.,

Statement of the case.

pay a certain warrant issued upon the treasurer in favor of the relator, by the auditor of public accounts.

An alternative writ was awarded, and then the cause, by agreement of parties, was removed into the Third Grand Division, to be heard at Ottawa.

The grounds of the application, and of the refusal of the treasurer to countersign and pay the warrant, will be seen from the following statement:

The relator alleges that the twenty-third general assembly of this State, which convened on the 5th day of January, 1863, passed an act entitled " an act to provide for the ordinary and contingent expenses of the government until the adjournment of the next regular session of the general assembly," which was signed by the speakers of the respective houses, and approved by the governor on the 14th day of February, 1863, and thereby became a law. That, among other things, that act provided as follows:

" Section 3. The sum of fifty thousand dollars be and the same is hereby appropriated, or so much thereof as may be necessary, to be disbursed in aid of the sick and wounded Illinois soldiers; to defray the contingent expenses of the executive department; for the pay of clerks in the governor's office; of messengers on public service by order of the governor; of assistants in the adjutant-general's office; quartermaster-general's office, and commissary-general's office; telegraphing; postage and other incidental expenses. The same to be expended as is provided in an act entitled 'An act to provide for extraordinary expenditures in the executive department,' approved May 2, 1861."

That in pursuance of that act and other laws in force, and for the purpose of relieving and in aid of the sick and wounded Illinois soldiers, intended to be, and who were provided for by said laws, there were filed, by the direction of the governor, in the office of the auditor of public accounts, the following papers:

" State of Illinois to steamer City of Alton, Dr. 1863. To services of boat and crew under charter of His Excellency

Governor Yates, for relief of sick and wounded volunteers at Vicksburg and Memphis, twelve and one-half days, viz.: from 12 o'clock M., June 9th, to and inclusive of 21st day of June, 1863, at $275 per day.   12½ days at $275 per day is $3,437.50. To subsistence of surgeons and nurses reported for care of sick and wounded soldiers from June 3d to and inclusive of June 21st, 1863, fifteen hundred and forty days, at $1.50 per day. 1540 days at $1.50 per day is $2,310.   Less 88 days for time of lying in Yazoo river for persons absent from meals, $132,00, $2,178.00.   Total, $5,615.50."

"I hereby certify I accompanied the delegation of surgeons and nurses to Vicksburg under order of his excellency, Governor Yates, and audited the accounts under the charter for said steamer; and that the time and services as charged above, are accurate and just.

"JOHN S. LOOMIS,<br>
"*Ass't Adj't-General Illinois.*

" ADJUTANT-GENERAL'S OFFICE,      }
" SPRINGFIELD, ILL., *June* 22, 1863."  }

" EXECUTIVE DEPARTMENT, ILLINOIS, }<br>
SPRINGFIELD, *June* 23, 1863.    }

" The auditor of public accounts will draw his warrant on the treasurer in favor of Capt. Wm. Barnes, of the steamer ' City of Alton,' for five thousand six hundred fifteen and $\frac{50}{100}$ dollars, the amount of the within bill, for the purposes therein specified, and charge the same to the account of the appropriations of February 14, 1863, for ' and of sick and wounded Illinois soldiers,' and other purposes.

"RICHARD YATES,<br>
"*Governor.*"

The relator alleges that the services referred to were performed by direction of the governor, and that the price agreed to be paid therefor, remains due and wholly unpaid.

And that in pursuance of law, and especially in pursuance of said act of February 14, 1863, and of said act of May 2,

1861, therein referred to, and by virtue of said vouchers and order of the governor, the auditor issued the following warrant upon Alexander Starne, as treasurer of the State of Illinois:

"No. 1,281.

$5,615.50.                    AUDITOR'S OFFICE, ILLINOIS,
                             SPRINGFIELD, *June* 23, 1853.

Treasurer of the State of Illinois, pay to Wm. Barnes, captain steamer 'City of Alton,' or order, fifty-six hundred fifteen $\frac{50}{100}$ dollars, for services of steamer 'City of Alton' and crew, proceeding for relief of sick and wounded Illinois soldiers at Memphis and Vicksburg, and for subsistence of surgeons and nurses, by order of the governor.

                             JESSE K. DUBOIS,
                                  *Auditor, P. A.*"

Countersigned and registered,

———————  —————, *Treas.*"

That on the same 23d day of June, said warrant was presented to the treasurer, and a demand was made upon him to countersign the same, in order that it might be paid in the due course of business; but the treasurer refused to countersign or pay said warrant; indorsing thereon his refusal, as follows:

"I have this day refused to countersign the within warrant, there being no appropriation for said object.

                             "ALEXANDER STARNE,

"June 23d, 1863."                        *Treasurer.*"

The relator prays that an alternative writ of mandamus be awarded against said Starne, requiring him to countersign and pay said warrant, or show cause why he should not do so.

The alternative writ was awarded, to which the respondent made return that he refused, and still refuses to countersign and register said warrant for the following reason; "said respondent denies that said warrant was issued in pursuance of, and by virtue of, any act of the general assembly of the State of Illinois, passed in conformity with the provisions of the Constitution of said State; he further denies that any appropriation

has been made by any law so passed for the payment of the said warrant, or of the claim upon which said warrant is based. He further denies that the said alleged act of the general assembly of the State of Illinois, of February 14, 1863, referred to by the relator in the petition for said writ, and under and in pursuance of which it is alleged said warrant was issued, or that the bill for said act was ever passed by the general assembly of the State of Illinois, in the manner required by the express provisions of the Constitution of said State."

"Respondent avers that said bill was not read three times on three different days, or otherwise, in the house of representatives of said State; nor was it passed with a concurrence of a majority of all the members elect in said house of representatives. That the journal of said house of representatives, kept in pursuance of the provisions of the Constitution of said State, does not show that the said bill for said act, or said act, was ever read, either by its title or otherwise, in the said house of representatives, and does not show that said bill was passed by the concurrence of a majority of all the members elect in said house, nor is any vote by ayes and noes on the final passage of any such bill, entered on the said journal of the said house of representatives. Respondent annexes hereto a copy of the bill for the said alleged act, in pursuance of which it is alleged said warrant was issued, and of the indorsements thereon, certified to by the secretary of State, as part of this, his return. By the indorsement of said bill, the copy whereof is hereto annexed, it appears that said bill is numbered '202,' which number, according to the usage and practice of the general assembly of the State of Illinois, is placed on the bill by the enrolling clerk of the senate, to designate said bill as senate bill, number '202;' that by the usage and practice of both houses of the general assembly, bills of said houses are thus designated by the numbers placed on the enrolled copies of such bills."

"Respondent repeats his denial that any such bill, a copy whereof is hereto annexed and above referred to, was ever passed by said house of representatives, or ever read in the

said house, as required by the Constitution of this State. Respondent further avers that, as appears by the journal of the said house of representatives, a senate bill with the same title as the bill, a copy whereof is hereto annexed as aforesaid, but numbered ' 203,' and not containing all the provisions contained in the said bill 'No. 202,' and not containing the provision or section referred to in the petition for said writ, or for any appropriation for the payment of any such claim for which said warrant was issued, was reported to the said house of representatives, as senate bill No. 203, and was read and passed by the said house, but that said last mentioned bill was not reported back to the senate, nor ever signed by the speakers, or approved by the governor, but remains as part of the unfinished business of the said house." For these reasons, the respondent asks that no peremptory writ of mandamus issue.

Annexed to this return was a copy, certified by the secretary of State, of what purports to be " an act to provide for the ordinary and contingent expenses of the government until the adjournment of the next regular session of the general assembly," the third section of which is the same as that given by the relator.   This act is signed in the following manner :

"S. A. BUCKMASTER,
"*Speaker of the House of Representatives.*

"FRANCIS A. HOFFMAN,
"*Speaker of the Senate.*

"Approved, February 14, 1863.
"RICHARD YATES,
"*Governor.*"

And upon the act are these indorsements:

"Originated in the senate.
"MANNING MAYFIELD, *Secretary.*
"98.

"Senate.                                          No. 64.

"An act to provide for the ordinary and contingent expenses

of the government until the adjournment of the next regular session of the general assembly.

" (202.)

" Enrolled."

The return of the respondent was traversed by the relator, and the issue was submitted to the court.

Messrs. GRIMSHAW & WILLIAMS, for the relator.

Article 4, section 23, new Constitution, 1 Purple, p. 56, provides for election of auditor, whose duties shall be regulated by law.

Article 4, new Constitution, section 24, 1 Purple, p. 57, provides for election of State treasurer. The duties of these officers are regulated by law, thus: By the schedule of the new Constitution, 1 Purple, p. 61, section 1, all laws not inconsistent with the new Constitution are continued in force.

The duties of the auditor are prescribed by act of 3d March, 1845, 1 Purple, p. 117, sections 7, 8, 9, 10.

The duty of the treasurer, after a warrant has been issued to him, as prescribed by said section 10, is to countersign and register a warrant issued by the auditor when presented to him.

The governor and all other civil officers are liable to impeachment for misdemeanor in office, during continuance in office, and for two years thereafter. New Constitution, art. 4, § 26, 1 Purple, 57.

The act of the extra session of 1861, extra Session Laws, p. 20, section 8, provides the mode by which the governor of the State shall ascertain and audit accounts on the war fund, and order the auditor to issue his warrant for payment when the governor has passed upon and certified to the accounts.

The act of the legislature of 1863, pp. 14, 15, and especially section 3 of said act, refers back to the act of 1861, above quoted, and provides that accounts shall be adjusted and warrants ordered to be issued by the governor, and that the auditor shall issue them in form and mode prescribed by said act of 1861.

The duty of the auditor was to present the warrant to the treasurer to countersign; and the treasurer's duty was to countersign the warrant when presented. 1 Purple, § 10, p. 117.

He, the treasurer, we insist, had no discretion to exercise, but a mere clerical duty to perform. If any wrong was done, the governor and auditor were responsible to the people for a violation of duty, and were liable to impeachment if they were guilty of official misconduct.

But it is said that the treasurer in his return sets up that the law of 1863 is no law, while we insist that the treasurer's duty was to "countersign" a warrant issued by the auditor, and presented to him for the purpose of "countersigning." The duties prescribed by law in that respect for the treasurer to perform are merely clerical, and are to be performed under the peremptory order of the statute. 1 Purple, p. 117, § 10.

Look for a moment at 1 Purple, p. 302, § 6, title "County Treasurer," which prohibits the payment of any money except in accordance with an order or decree of county authorities (call them county commissioners, county courts, or boards of supervisors, as you please), or by virtue of a law specifically directing such payment to be made. Such county orders are to be indorsed by the county treasurer when presented, and registered and paid in the order of presentation; will it be pretended that every county treasurer in the State has a right to set up his opinion and refuse, under these sections, to indorse upon, register, and ultimately pay such orders as the county authorities issue?

Would the State treasurer have a right to refuse to countersign a warrant drawn by the auditor for a salary, by assuming that the officer in whose favor the warrant was drawn was not properly elected, or had not rendered the services for which it was issued?

The attempt is revolutionary, and would entirely stop the wheels of government if it is permitted; it is placing in the State treasurer's hands more power than can be exercised by any other department of government; he would, in effect,

control the purse; a more powerful lever oft'times than the sword.

. While we insist that the allegations in the return are not true, and that the protestations as to the passage of the law in question were an afterthought to get rid of what, to the members protesting, was (to use their own language) an "obnoxious appropriation," to-wit: An appropriation in aid of sick and wounded Illinois soldiers, the contingent expenses of the executive department, &c. We believe that the law does not permit any person or tribunal to go behind the law.

The return itself shows the law of 1863, upon which we rely, to have been signed by the speakers of both houses, and by the governor of the State. The published statutes show the same law duly certified. No one can go behind this evidence.

By sec. 1, p. 541, 1 Purple Stat., the printed statute books of this State are made evidence.

Article 3, sec. 23, of Constitution, 1 Purple, 48, provides that every bill "having passed both houses, shall be signed by the speakers of their respective houses."

Article 4, sec. 21, of Constitution, 1 Purple, 56, provides that "every bill which shall have passed both houses, shall, before it becomes a law, be presented to the governor; if he approve he shall sign it."

The return shows the signature of the speakers of both houses and of the governor to the act of 1863, and the published laws, regularly certified, contain the act.

"Bills which have passed both houses of parliament, and have been signed by the king, are incorporated into the statutes, and have force as the express will of the highest power in England;" Smith's Commentaries, 41.

"Statutes in England are never to be put in issue by *nul tiel* record, courts take judicial knowledge of them."

"The journal is of good use for the observation of the generalty and materialty of proceedings and deliberations, as to the three readings of any bill, the intercourse between the two houses, and the like; but when the act is passed the journal is expired;" Hobart, No. 110, pp. 244, 248.

"Public laws will not be set aside on an allegation of fraud in their passage." *Stark* v. *McGowen,* 1 Nott & McCord, 400.

"A bill must be tested by the signatures of the presiding officers of the two houses and of the governor." *Pacific R. R.* v. *Governor,* 23 Mo. 364.

We understand that the defendant relies on the case of *Jacoby* v. *Spangler,* 14 Ill. 298. Now while it may be true that the journals of each branch of the legislature are evidence of the action of that branch, and in the language of the case in Hobart, "of the intercourse between the two houses and the like," yet to use the language of the case in Hobart, "when the act is passed the journal is expired."

The court in *Jacoby* v. *Spangler,* places the journals and acts of legislature that have gone through all the forms of legislation, and have been deposited according to law in the office of secretary of State, on an equal footing, as evidence, and the same case recognizes the printed statute books as evidence of what the law is.

There is no journal of either house deposited in the secretary of State's office, as required by sec. 8, chap. 96, 2 Purple, 1082; Id. chap. 62, sec. 3, which require journals to be copied. The number of a bill when transmitted from one house to the other does not identify it, the title is the identification. Cushing's Law of Legislative Assemblies, chap. 17, sec. 2292, p. 887.

Signing of a bill by speaker is an official act only to be done when the house is in session with a quorum. Cushing, chap. 22, sec. 2374, p. 918. Courts should never declare a statute void except on clear grounds. *Erie & N. E. R. R.* v. *Casey,* 2 Casey, 126 Penn. 300, 317.

And upon which deposit in said secretary's office, whereby such journals would become records, as it is said, the whole theory of the case of *Jacoby* v. *Spangler* is based.

True this does not appear on the issue on this demurrer, but it does appear, that while the petition alleges the existence of certain laws, the return does not allege the existence of a journal deposited in secretary of State's office, and for a very good reason, that there is no journal in the secretary's office, which,

even on the theory of *Jacoby* v. *Spangler*, would be evidence against the signed law.

But we insist that while the case of *Jacoby* v. *Spangler*, showed affirmatively, by the agreed state of case, that the journal did not show the passage of the bill, yet that the principle of the decision was wrong. The evidence of the passage of the bill was the signature of the speakers of the houses and of the governor.

We know that the defense would like to drive us to make up an issue of fact on the statements of the answer; we think that the answer presents no legal defense, and fails to present the legal proposition, arising on the petition and answer. If that is decided against us, we ask to withdraw the demurrer, and make an issue of fact. We hope that the case can be fairly tried on the issue of law. If the defense had the legal right to meet the allegations of petition, that the warrant issued was not issued by authority of law, for the frivolous pretense set up in return, still it was incumbent on the defense to allege the existence of journals, which had been examined, passed upon, and certified to at the proper time by the officers of the house and senate and according to law deposited in the secretary's office, and even if the court adheres to the theory of *Jacoby* v. *Spangler*, the allegations in the answer are not sufficient in law. There is no allegation of the legal existence of a journal of either house.

In *Turley's Heirs* v. *Logan County*, which may be referred to (see 17 Ill. 152), the court went behind the law.

The opinion was delivered by Chief Justice SCATES, who had been a member of the convention, and who, like many other men of ability in that body, fancied that the members alone had a sufficiently high appreciation of the Constitution. In that case Justice SKINNER refused to concur.

The court attempts to avoid the effect of the decision in the case of *Pacific R. R.* v. *Governor*, 23 Mo. 364, by saying that the constitutions are different in Illinois and Missouri.

The parliamentary rules and practice in England and various States were substantially the same as the rule adopted by our

Constitution. In England and most States, usage and unwritten law govern; in this State, usage and a Constitution govern. The effect is the same, and the rule should be that the signatures of the speakers of the houses and of the executive, are evidence of a law.

If such issues can be got up as are presented by the return then there is an end of law.

If we send bad men to the legislature and they elect bad officers, let us correct the evil by electing better men; but that a State treasurer should set himself up as the judge of the validity of a law signed by the proper officers and published and treated as a law and that too when it is notorious that the journals have been willfully kept out of their proper place of deposit (the office of the secretary of State), it will certainly not conduce to the smooth working of the government. We hope for the sake of humanity that we have the law with us.

Our attention has been called upon the argument to the following cases:

The *People* v. *Purdy*, 2 Hill, 32, in Supreme Court. One question in this case was: Did the law require a majority or a two-thirds vote in order to pass it?

The court was divided in opinion on the merits of the case. Judge BRONSON says that it required two-thirds, and decided, under a statute of New York, which reads, "That no bill shall be deemed to have passed by the assent of two-thirds of the members elected to each house, unless so certified by the presiding officer of each house," that such certificates not having been published, together with the governor's approval, with the body of the law, he would look at the engrossed bill and from that he decides, Id. p. 35, "that the bill was not a law."

Judge COWEN and Chief Justice NELSON decide that it was a majority bill and do not determine any question as to the contradicting of a law by evidence outside of the signatures of speakers and the governor, but render judgment of ouster against Purdy.

The case again makes its appearance in 4 Hill, 384, in Court of Errors. The Chancellor, WALWORTH, on p. 390,

inclines to agree with Judge BRONSON. Senator PAIGE inclines to concur with the Chancellor, as to right to go behind signatures of officers, etc. A vote was taken and resulted by 13 to 11 in a reversal of judgment of Supreme Court. These cases are of no value as authority.

The case of *McCulloch* v. *The State*, 11 Indiana, 430, only decides that journals as such import verity and can only be corrected by the hands that kept them, and we still recur to the position that the law signed by the speakers and the governor and certified, is the only safe evidence.

Messrs. STEWART, EDWARDS & BROWN, for the respondent.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

This was an application for a peremptory writ of mandamus, to compel the State treasurer to countersign and register an auditor's warrant. The journals of the two houses of the general assembly, not having been returned and filed with the secretary of State, and still being in the hands of the clerks of the two houses, the auditor acted alone upon the bill signed by the president of the senate, the speaker of the house, and approved by the governor, which was regularly deposited in the office of the secretary of State as a valid and binding law. By the defendant it is insisted that whilst the bill has the forms of law, it was in fact never passed by the house of representatives, and consequently has no binding force.

The petition sets up a performance of services, which, if the act is binding as a law, entitles relator to a warrant on the treasury, for the sum allowed by the governor. Nor does the return controvert the correctness of the charges made for the services rendered, but relies alone as a defense upon the allegation that there is no law authorizing its payment. The return denies that the bill making the appropriation for the payment for such services, and under which the warrant was drawn, was ever adopted, or became a law, and that there is any legal authority

for countersigning or registering this warrant. It also alleges, that the bill under which it was drawn, was never passed by the house, but was substituted for a bill that did pass that body, and was presented to the speaker and by him signed and also approved by the governor.

It appears from the senate journal, that two bills were introduced into and passed that body with precisely the same title. They were entitled, "An act to provide for the ordinary and contingent expenses of the government until the adjournment of the next regular session of the general assembly." One of these bills was numbered two hundred and two, and the other two hundred and three. The bill in dispute was two hundred and two, and contained a section appropriating fifty thousand dollars, or so much thereof as might be necessary, to be disbursed in aid of sick and wounded Illinois soldiers; to defray the contingent expenses of the executive department; for the pay of clerks in the governor's office; of messengers on public service, by order of the governor; of assistants in the adjutant-general's office; quartermaster-general's, and commissary-general's office; telegraphing; postage and other incidental expenses. The same to be expended as provided in an act to provide for extraordinary expenditures in the executive department.

It is alleged that bill number two hundred and three, which was passed by the house, did not contain all of the provisions contained in bill two hundred and two, and that the provisions before referred to, were not in the first named bill. The journals of the senate show that both of these bills were passed by that body, and were sent to the house for its concurrence. The house journal shows, that on the 14th day of February, 1863, bill numbered two hundred and three, was taken up and passed, but no action appears from the journals, to have been taken upon bill numbered two hundred and two. But the senate journal shows, that on the third day of June, 1863, that body received a message from the house informing them that the house had concurred in the passage of senate bill two hundred and three, and also that through error the bill two hundred and

two was reported back to the senate as having passed the house, and that it did not pass, and asking its return.

Oral evidence was received in the case, only to identify the journals of the two houses, and these two bills, but for no other purpose. From that evidence it appears that these two bills were distinguished from each other by the numbers they severally bore, and which had been placed on them by the clerk of the senate. It also appears from the house journal that it was bill numbered two hundred and three, which passed that body and they failed to show, that bill numbered two hundred and two, the bill in controversy, ever passed the house. No entry in reference to the latter bill is found on the house journals at either the regular or adjourned session. As to that bill, it seems that the house at no time ever took any action whatever, unless it was to request the senate to return it to the house. Thus it is clear from the journals that the bill under consideration was never adopted as a law, notwithstanding it has the signatures of the two speakers and the approval of the governor.

Were it not for the somewhat peculiar provision of our Constitution, which requires that all bills, before they can become laws, shall be read three several times in each house, and shall be passed by a vote of a majority of all the members elect, a bill thus signed and approved would be conclusive of its validity and binding force as a law. But this provision having been adopted, to prevent improvident legislation, and to prevent the enforcement of bills that were never enacted into laws, the means for its enforcement are implied. It is true that these means are negative and not positive in their character. Whilst neither of the other coördinate branches of the government have authority to command its observance, the judicial and executive departments are not bound to enforce such bills as laws. Whilst they are *prima facie* binding, still, when it appears from the journals, that either of these constitutional requirements is wanting, the provisions of the bill will not be enforced. According to the theory of our legislation, when a bill has became a law, there must be record evidence of every material require-

ment, from its introduction until it becomes a law. And this evidence is found upon the journals of the two houses.

The question has been ·discussed whether the journals may be referred to, for the purpose of overcoming the presumption of the validity of a printed act with all the forms of a law. Were the question one of first impression, it might be more embarrassing than it now is, having been in numerous cases authoritatively determined, by this and other tribunals of sister states, whose organic laws contain substantially similar provisions to that of ours. In fact, so far as we have been able to find, the decisions, in every case but one, where this question has arisen, hold that the journals may be resorted to for the purpose of invalidating the enactment. We are not, however, prepared to say that a different rule might not have subserved the public interest equally well, leaving the legislature and the executive to guard the public interest in this regard, or to become responsible for its neglect.

., The case of *The State* v. *McBride,* 4 Mo. 303, is perhaps one of the earliest cases in which the question has arisen whether the journals of the two houses might be resorted to for the purpose of showing a want of compliance with the requirements of the Constitution. That case involved the question, whether an amendment of the State Constitution had been adopted by a two-third vote of the two houses as that instrument required. It was there held that as two-thirds of the members had voted for the amendment, it became a part of their organic law. The fact that the court refer to the number of votes cast, is conclusive to our minds that the journals were consulted and controlled the decision of the court. In that case the question was raised and insisted upon, that the court had no right to go behind the signatures of the speakers, and the approval of the governor, but the houses were the judges whether they had proceeded constitutionally. But the objection was disallowed when the court made the inquiry, and passed upon the question.

In the case of *Thomas* v. *Dakin,* 22 Wend. 9, this question was before the court. In the decision of that case, the constitutionality of their general banking law was involved. It was

there intimated but not directly decided, that it must appear that the constitutional requirement, that two-thirds of the members of each house must concur in its passage, must be observed. It was, however, held, that the question should have been presented by plea, and the question was not determined in that case.  In the case of *Warner* v. *Beers*, 23 Wend. 103, the same question arose, and it was held that the banks formed under the general law of the State, on that subject, were not corporations in the legal acceptation of the term, and that a two-third vote was not requisite to the validity of the law.  Chancellor WALWORTH, in delivering a separate opinion in the last named case, says that upon a demurrer to the declaration, the court will not look beyond the statute book, to ascertain whether the act was passed by a two-thirds vote, or by a mere majority, if a court has such power in any mode to institute such an inquiry.  But he expressly waives a decision of that question.

The Supreme Court of Ohio in the case of *The State* v. *Maffitt*, 5 Ohio, 223, held, that the journals of the two houses might be resorted to, for the purpose of determining whether a person acting as a judge had been properly elected by the legislature.  Again in the case of *The People* v. *Purdy*, 2 Hill, 31, Chief Justice BRONSON, in a dissenting opinion, held that when the question was raised, whether an act had been adopted by a vote of two-thirds of the members of the legislature, the question may be determined by the journals.  This case was taken to the Court of Errors, where the decision of the Supreme Court was reversed.  A portion of the members of the court placed their decision upon the same grounds that had been taken by Chief Justice BRONSON.

In the case of *Debow* v. *The People*, 1 Denio, 9, the Supreme Court of New York held that it was the duty of the court to examine and decide whether any law falling within the two-thirds clause of the Constitution, has received the required number of votes to give it validity.  It was also held that if it had not, the supposed law was utterly void.  And in that case, it is said, that the conclusion is sustained, not by mere *dicta*, but upon the express adjudications of the Court for the

Correction of Errors. Again, in the case of *Eld* v. *Gorham*, 20 Cow. 9, it is said, " Although it would indeed be practicable, by an examination of the journals and files of the two branches of the legislature, to ascertain which those revised acts are, it would in most cases be exceedingly inconvenient, and in some very difficult to do so, from a want of access to those sources of information. The question in this case was whether an act embraced in the printed volume of revised laws of the State, had in fact been revised, and it is manifest from the opinion, that the court regarded a resort to the journals as a legitimate mode of determining whether a law had been properly enacted. It is true the court says that such a course would be inconvenient and in some cases difficult, but they say it would be practicable.

In the Supreme Court of Indiana, in the case of *McCulloch* v. *The State*, 11 Ind. 524, it was held, that the journals of the two houses, being required by the Constitution to be kept, are conclusive evidence of the facts appearing upon their face. And the case of *Green* v. *Graves*, 1 Douglass (Mich.), 351, seems to fully recognize the rule, that the journals may be resorted to, for the purpose of ascertaining whether a law has been constitutionally adopted. In the case of *Furgusson* v. *The Miners' Bank*, Smeed (Tenn.), 609, it is held that where a bill has not been read on three several days, in each house, as required by the Constitution, it would fail to become a law.

The case of *Southworth* v. *Palmyra & Jackson R. R.*, 2 Gibbs (Mich.), 287, recognizes the right of the court to look beyond the enrolled bill, to determine whether two-thirds of the members of each house had voted for the bill, in accordance with the requirements of the fundamental law. It is true, in this case, that the question before the court was whether the Constitution required two-thirds of all the members elect or only of a quorum to pass such a bill. But the fact that the court looked into the journals in determining the question, and decided that the bill had the requisite number of votes, shows that the court exercised the power to go behind the signatures of the speakers and approval of the governor, to determine the validity of the

law.  In the case of *Fowler* v. *Pierce*, 2 Cal. 165, the court
held the enrolled bill was *prima facie* valid, but the courts
might go behind the bill, to ascertain whether all the constitu-
tional requirements had been performed, — its *prima facie*
character might be rebutted.  Such is the position taken by
most if not all of the cases before referred to, and seems to be
the settled law of those courts.  The enrolled bill or printed
volume of laws will be regarded as having received all the
essential requirements, to render them valid and binding, until
that presumption is rebutted by the journals of the two houses.

Again, the Supreme Court of New Hampshire, in an opinion
given to the governor of the State, 35 N. H. 579, hold that the
journals of the two houses may be inspected, for the purpose
of ascertaining whether what purports to be a law has received
the assent of the two houses in the mode prescribed by the Con-
stitution.  In that case the bill was signed by the speakers of
both houses, and had received the approval of the governor.
They held that in such a case the bill is *prima facie*, but not
conclusively, a law, but where it fails to appear by the journals
that one of the houses had concurred in an amendment to the
bill, that the presumption was destroyed, and the bill would be
held inoperative and void as an enactment.  That the evidence
of its passage must appear from the journals or it would not be
sustained.

Opposed to these cases, we only find that of *Green* v. *Wil-
bur*, 33 George (Miss.), 650.  It was there held by a majority
of a divided court, that the signatures of the speakers of the
two houses, and the approval of the bill by the governor, was
conclusive.  But the dissenting opinion of Chief Justice SMITH
maintains the opposite ground, and is, to our minds, the most
satisfactory, as being in harmony with the rule adopted by
other courts.

Having referred to the decisions of other courts, on this ques-
tion, it may be proper to refer to the cases determined by our
own court.  The first case in our reports is *The People* v.
*Campbell*, 3 Gilm. 466.  It was there held, that the legislature
did not possess the power to repeal a law, by joint resolution,

without undergoing the three several readings prescribed by the Constitution. It is true, it does not appear that any question was raised as to the right of the court to resort to the journals of the two houses to test the validity of the law. But the journals were resorted to, and upon them the case was decided.

The next case is that of *Spangler* v. *Jacoby*, 14 Ill. 297. In that case it was urged that the law was inoperative and void, because a majority of all the members elect, in each branch of the legislature, did not concur in its passage. And the court sustained the objection, holding, that the ayes and noes appearing upon the journals is the only test of its validity, and that they must appear upon the journals. It was likewise held that the printed statute book is not conclusive evidence of the correctness of a law, but that it may be corrected by the enrolled bill on file in the office of the secretary of State. It was also held, that it may be shown from the journals that a particular act passed in conformity to the requirements of the Constitution. That when the validity of such an act is denied, the journals may be appealed to for the purpose of determining the question. It was also held, that the signatures of the speaker of the senate, the speaker of the house, and the approval of the governor of the State, to a bill is presumptive evidence that it became a law under the Constitution; but the presumption may be rebutted by the journals of the two houses. And the court on the evidence afforded by the journals, held that the constitutional requirements had not been observed, and that the law was inoperative and void.

The next case is that of *Turley* v. *Logan County*, 17 Ill. 151. It was there held, that the journals must show, that the constitutional requirements had been observed. The court also fully recognize the principle announced in the case of *Spangler* v. *Jacoby*. The journals having been produced, it appeared, that the same legislature had corrected their journals, at a subsequent session, from the minutes of the clerk, so as to conform to the constitutional requirements; this was held to be sufficient, and the validity of the law was sustained.

The next case is that of *Prescott* v. *The Board of Trustees, Ill. & Mich. Canal*, 19 Ill. 324. It was there held, that an act was inoperative, because the journal failed to show that the senate had concurred in an amendment to the bill adopted by the house. The journals were inspected, and the court held, that they overcome the presumption created by the signatures of the speakers of the two houses, and approval of the governor. The case of *Spangler* v. *Jacoby*, was again referred to and approved, as announcing the correct rule. The case of *The Supervisors* v. *The People*, 25 Ill. 181, limits the rule adopted in *Campbell* v. *The People*. It is there held that although the journals failed to show that the bill was read three several times in each house, the Constitution not requiring that fact to be recorded, the law would not for that reason be invalid. But it was there said, in accordance with the rule in the case of *Spangler* v. *Jacoby*, that under the Constitution it was requisite to the validity of an act that the ayes and noes should appear upon the journals.

Upon an inspection of the house journal, it appears that the bill in controversy was never put upon its passage. It does not appear to have been read in the house or any vote taken upon either reading or its passage. The journal is wholly silent as to this bill, and it does not appear that the ayes and noes were called and spread upon the journals upon its passage, or that a majority of the members elect voted for its adoption. We have seen that all the cases in which the question has been presented to this court, hold that this fact must appear upon the journals as a requisite to the validity of a law. This being wanting the law was a nullity, and the auditor was not authorized to draw the warrant or the treasurer to countersign and register it. The journals do show, however, that a bill of the same title, but containing different provisions, did pass the house, and owing to the similarity of the titles of the two bills or by some other means, this bill was signed and approved. This appears by the journal of the house and from its message to the senate, in which they say that the bill never passed that body.

To hold this to be a valid law, we would have to reverse all

of the former decisions of this court on the question, as well as disregard the current of the decisions of other courts in the different states of the Union.    Whatever may have been our inclination, had the question been presented for the first time by this case, the weight of authority and the prior decisions of this court must control.    But we have reviewed all the cases in which the question has been presented, so far as we have been able to find them, and thus it is seen that the decisions of this court are in harmony with the adjudged cases of other courts.

For these reasons the writ of mandamus must be refused.

*Mandamus refused.*

BREESE, J. : I concur in refusing the mandamus.