Bradbury, J.
The authority of the general
assembly to change the subdivisions of the second judicial district to the extent that was attempted by the act of May 17,1894 (91 Ohio Laws, 280), is the only question raised by the record before us. That the general assembly has authority to change the subdivisions of a judicial district to some extent is not denied by counsel for respondent; indeed section 15, of article IY of the Constitution of 1851, directly grants such power “whenever two-thirds of the members .elected to each house *74 shall concur therein.” The power given to the general assembly by the terms of this section, when considered alone, is limited only by the requirement that two-thirds of the members elected to each house shall concur in the alteration. This court, however, has held that the power vested in the legislature by this section is limited by the provisions of section 3 of the same article. Dist. Court case, 34 Ohio St., 431.
Counsel for respondent contend that the statute in question violates' those provisions of section 3 of article IV of the Constitution, which declares that the subdivisions shall be “of compact territory, bounded by county lines and as nearly equal in population as practicable. ” The answer under consideration discloses that the territory composing the second judicial district is susceptible of a more compact division than was made by the act in question, and yet preserve intact county boundaries, and that, without disturbing county lines, the population of the several subdivisions might have been made much more nearly equal than they were made. In fact the inequality between the population of the first subdivision and that of the other two is striking: That of the first being only 60,440, while that of the second is 214,-240 and that of the third, 235,075. The difference between the largest and the smallest population being nearly four fold.
If these provisions of our Constitution are merely directory they, of course, impose no obligation upon the general assembly enforceable by any judicial tribunal: Grave doubts were expressed by an author of recognized authority in a treatise upon constitutional law of established reputation, whether any constitutional provision *75 should be held to be directory rather than mandatory, but on the contrary insisting that the edicts of the people enunciated through the medium of written constitutions, from their nature and the object sought to be attained by them, were mandates to be obeyed, and not advisory exhortations to be followed or not as the functionaries addressed may choose. Cooley on Cons. Lira., 93, 97. This view of the question is taken in many of the adjudications upon the subject. Lemons v. State, 4 West Va., 755; Nevada v. Rogers, 10 Nevada, 250; Cannon v. Mathes, 8 Heisk., 516; Spangler v. Jacoby, 14 Ill., 297; Varney v. Justice, 86 Ky., 596; The People v. Lawrence, 36 Barb., 178. There are many other cases in which substantially the same doctrine is sanctioned. McCulloch v. State, 11 Ind., 424; Wolcott v. Wigton, 7 Ind., 44; People v. Campbell, 8 Gilman, (Ill.), 466; State v. Johnson, 26 Ark., 281; Barnes v. Starne, Treas., 35 Ill., 121; State ex rel. v. Glenn et al., 18 Nevada, 34; Ryan v. Lynch, 68 Ill., 160.
This court, however, has held a number of the provisions of the constitution of 1851, relating- to the general assembly, to be merely directory, the observance of which rests entirely upon a sense of duty and a regard to their official oath by the members thereof. Miller v. State, 3 Ohio St., 475; State v. Covington, 29 Ohio St., 102; Bloom v. Xenia, 32 Ohio St., 463; Seeley v. Thomas, 31 Ohio St., 301.
This doctrine finds support in the decisions of the highest courts of some of the other states. City of Girardeau v. Riley, 52 Mo., 424; People v. Supervisors of Chenango, 8 N. Y., 317; McPherson v. Leonard, 29 Md., 377.
We are of the opinion, however, that the provi *76 sions of the constitution now under consideration were intended to be mandatory, but are embarrassed in every attempt we make to find limits within which to confine the power of the general assembly, when we consider the language employed by the constitution, and the construction placed upon it by the convention itself. The provision is that the subdivisions of the judicial districts shall be “of compact territory bounded by county lines and as nearly equal in population as practicable. ’ ’ It is apparent that the first clause of this provision denies to the general assembly any power to divide a county, in subdividing a judicial district, because the subdivision must be bounded by county lines, and this would be impossible if one part of a county was in one subdivision and another part of it in another subdivision; for in such* ease the boundary of the subdivision would pass through the divided county, and the subdivision would not be bounded by county lines. In this respect a limit is set to the legislative power over the subject which is capable of being ascertained and • declared. So the requirement that the territory shall be “compact ” undoubtedly requires that the counties composing a' judicial subdivision shall be adjacent, and denies to the general assembly the authority to create a subdivision consisting of separate bodies of territory. The word “compact” has various shades of meaning, even in this connection, one' of which is “joined or held together;” and in view of the action of the convention itself, when it came to divide the state into judicial districts, and the districts into subdivisions, we cannot declare that it did not employ the word in this sense, but in the sense that the territory should be made as nearly square *77 in form as the lines of counties would permit. The Constitution declares not only that the subdivisions, but the judicial districts themselves, shall be of “compact territory,” yet the convention that framed the' instrument, when it came to the duty of creating'judicial districts and subdivisions, made some of them consist of long and comparatively narrow strips of territory. This is notably the case in the fourth and fifth districts, the former of which extends along Lake Erie from Lucas county to Cuyahoga county, both inclusive, and the latter reaching from Franklin county in the center of the state to the Ohio river. Here was given a practical construction of the word, “compact” by the body that used it, which, at least, fairly demonstrates that it was not used in the sense of requiring the territory to be divided in its most compact form, that is, as nearly square as was possible. If it was not employed in that sense, what standard does the Constitution furnish by which the judiciary may determine the limits beyond which the territory may -not be' narrowed and lengthened, in a straight line or otherwise, in the discretion of the General Assembly.. If the people desire to limit the scope of' legislative action in its legitimate sphere, by constitutional provisions, they must mark the boundaries of that action so distinctly that they may be recognized and declared with certainty. They have failed to do that here, and we should not create them by conjecture. "We have seen that the language employed by the Constitution, as well as the practical construction put upon it by the action of the body that framed it, does not require that either the judicial districts or their subdivisions shall be created in the most compact form consist *78 ent with preserving intact county lines. The General Assembly, having a discretion in the matter, there is nothing in the Constitution from which the judiciary can establish and declare a proportion beyond which the length shall not exceed the width of a judicial district or subdivision, or if one is made materially longer than wide, that the length shall be in a straight line.
The same difficulty and uncertainty respecting the boundaries of judicial discretion relative to the variations of populations, permissible between the several subdivisions, arise when we approach the question respecting the extent that the population of the several subdivisions of a judicial district may vary. The constitutional mandate is that the subdivisions, into which a judicial district may be divided, shall be ‘ £as nearly equal as practicable.” These words denote discretion. Where is it lodged?- Who is to determine what is practicable- in this respect? Evidently that body whose duty, under the constitution, it is to create the'judicial districts and subdivide them, and this duty is lodged in the legislature. The constitution is silent respecting the circumstances that the general assembly may consider in determining what is practicable in this regard. We have seen that this body under another provision of this clause, must preserve county lines, and use adjacent territory in creating judicial districts and subdividing them. If the only circumstances to be considered by the legislature in performing this duty are, that county -lines must be respected, and the territory of each district or subdivision kept separate and entire, then the duty would be little, if any, more than Clerical, and would involve no discretion whatever. A map, together with a *79 census report of the population of the several counties, is all that would be necessary to a complete performance of this duty by any one. The boundaries of discretion being thus narrowed and plainly marked, could be readily ascertained and declared, and if the populations of the several subdivisions of a district were not made as nearly equal as could be done, and yet respect county lines or preserve the territory of each subdivision intact, then the constitutional mandate would be broken and relief afforded by the judiciary.
Considering the language, merely, of the Constitution, and it leads us to the conclusion that legislative discretion in this matter is much broader than the narrow limits above suggested. And this construction was adopted by the framers of the Constitution themselves when they divided the state into districts and subdivisions for judicial purposes. In subdividing the third judicial district, the constitutional convention put into the the first subdivision a population, according to the census of 1850, of more than eighty-nine thousand; into the third subdivision. eighty-two thousand three hundred and eighty-three, while the second subdivision contained only forty-seven thousand, six hundred and ninety-one inhabitants.
In subdividing the fourth judicial district the same disregard of equality in respect to population was manifested by the constitutional convention. Cuyahoga county was alone made one subdivision with a population of forty-eight thousand and ninety-nine, while the other two subdivisions had respectively seventy-four thousand three hundred and thirty-seven,, and seventy-eight thousand and thirteen, inhabitants. In dividing these two districts it was practicable, regard be-. *80 ing had only to preserving county lines and territorial integrity, to have made their respective populations much more nearly equal; the inference is, therefore, irresistible, that the contemporaneous construction given to this provision of the Constitution, by the body that made it, authorizes other circumstances to be considered, in subdividing judicial districts, than those of preserving county lines intact and territorial unity. The Constitution does not indicate the character of such circumstances. We may conjecture that the convention in making Cuyahoga county, alone, one subdivision of the fourth' judicial district, though its population at the time was not much greater than one-half of that of either of the other two subdivisions, had regard to the commercial character of the inhabitants of the young and growing city of Cleveland, which was in that county, and its probable rapid growth. We may also conjecture that the convention in placing* the seven counties of Mercer, Van Wert, Putnam, Paulding, Defiance, Williams and Henry in one subdivision of the third district, the united population of all amounting to only forty-seven thousand six hundred and ninety-one, while the other two subdivisions had respectively, eighty-nine thousand and forty, and eighty-two thousand three hundred and eighty-three, had regard to the circumstance that the former were comparatively new counties, opening up to settlement, and would probably increase in population, relatively, faster than the other counties of the district.
No doubt many other circumstances may arise from time to time that should be weighed in determining how far from equality the populations of the judicial subdivisions may be permitted to *81 vary. But the Constitution has prescribed no limits to their number or their inherent force, ascertainable by the judicial department of the government. In respect to the exercise of its discretion in this regard the General Assembly is responsible to the public and its own sense of right and wrong, and its action is not subject to control or revision by the judiciary.

Peremptory writ awarded.