Lafferty &c v. Huffman, &c.

---

CASE 17—PETITION EQUITY—APRIL 1.

# Lafferty, &c v. Huffman, &c.

### APPEAL FROM HARRISON CIRCUIT COURT.

1. CONSTITUTIONAL LAW—ENROLLED BILL CAN NOT BE IMPEACHED BY JOURNALS.—An enrolled bill, when attested by the presiding officers of the two Houses of the General Assembly, as required by law, can not be impeached by the journals of those Houses, and must be accepted by the courts as the bill adopted by the legislature and as conclusive of the regularity of the steps taken in its passage.

   To do otherwise, would be for the courts to scrutinize the manner in which the legislative department may have performed the details of its work, or to arrogate to themselves a supervisory power wholly inconsistent with the fundamental truth that the departments of government are equal and independent in their respective spheres.

2. LOCAL OPTION—RIGHT OF TOWN OF SIXTH CLASS TO TAKE VOTE.— It is plain both from the general local option law and the act for the government of towns of the sixth class, that a separate vote on the question whether liquor shall be sold in the town may be had in the town, although it may have formed a part of a magisterial precinct in which a special prohibitory law was in force at the time the present local option law went into effect. It is not necessary that the vote be taken in the whole magisterial precinct. (Distinguished from King v. Com., 86 Ky., 436.)

Lafferty, &c v. Huffman, &c.

3. OFFICERS—RIGHT OF TOWN TRUSTEES TO HOLD OVER.—Where there was no election in November, 1893, in a town of the sixth class for town trustees, the old trustees held over under the express provisions of section 167 of the Constitution until their successors are elected and qualified.

J. Q. WARD FOR APPELLANTS.

1. The Constitution having authorized such an election as was held, and the General Assembly having passed a general law as directed by the Constitution, and the people having attended the election and voted, and the same having conformed to the law in all respects, the validity of the statute should be sustained. (Hall v. Commonwealth, 15 Law Rep., 104.)
2. Where no trustees were elected in towns of the sixth class in November, 1893, the old trustees hold until their successors are elected and qualified. (Sec. 167 of the Constitution), and their acts are validated by the Acts of 1894, being sec. 3672, Ky. Statutes.)
3. All local option laws in this State in force at the time of the adoption of the present Constitution were so changed by the Constitution and the laws enacted in conformity thereto, that they can be repealed, changed or annulled by a vote taken in a county, district or town as provided by the Constitution and laws.

BLANTON & BERRY FOR APPELLEES.

1. The terms of the trustees of the town of Berry, elected in April, 1893, no election having been held in November, 1893, as required by the Constitution and by the charter of towns of the sixth class, expired in November, 1893, and the failure to then elect trustees created a vacancy in the entire board, which could only be filled by appointment by the county judge, as provided in amendment to charter. Chapter 81 Acts, 1894, page 187. Persons claiming to be trustees, without being elected or appointed, may be enjoined from executing or proceeding under an unconstitutional law. (Spelling Extraordinary Relief, section 633.)
2. A bill did not have the yea and nay vote called and entered upon the journal, when put upon its final passage, has not been constitutionally passed or enacted, and is invalid. (Section 46 of constitution is mandatory.

Therefore, the act known as the Local Option Law, being chapter 89 of Acts 1891, 1892, 1893, not having been enacted as

required by section 46 of Constitution, is unconstitutional and invalid. (Norman, Auditor, v. Board of Managers, 93 Ky., 537.)

3. Even if constitutionally enacted, neither that Local Option Law nor the Charter of Towns of the Sixth Class, either expressly or by necessary implication, repeals any of the provisions of a special act, approved March 6, 1884, entitled: "An Act to regulate the sale of spirituous, vinous and malt liquors in the Berryville precinct in Harrison county."

Said act having become operative by a vote of the precinct remains in force in the town of Berry, until expressly repealed, and an election held in the town of Berry (which is a part of the precinct) submitting the proposition of "sale or no sale" is illegal and void, as the law must be repealed by the same authority which enacted it.

4. Mandamus and injunction are the proper remedies to prevent an officer from doing an illegal act "under color and claim of official authority which tends to impair public rights, or will result in irreparable or serious injury to private citizens, or when preventive relief is necessary to prevent a multiplicity of suits." (Spelling Extraordinary Relief, Section 609.)

5. A general law or statute, without negative words, does not repeal a previous special or local law, though the provisions of the two may differ. (Commonwealth v. Cain & Weller, 14 Bush., 218 and 532.) But a general law is repealed by a subsequent local law, when the former is inconsistent with the latter. (Haynes v. Commonwealth, 94 Ky., 237.)

·6. The answer does not deny or meet the allegations of the petition, and is bad on demurrer; the petition being taken for true, the court did not err in granting the relief sought.

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

Pursuant to the provisions of what is known as the "local option" law of August 4, 1892, a vote in the town of Berry, in Harrison county, was taken on January 31, 1894, and resulted in favor of the sale of spirituous, vinous and malt liquors.

When the county judge was about to direct the certificate of the election officers to be entered of record, and the trustees of the town were accordingly about to grant licenses, the appellees, certain citizens of the town, instituted this

suit to prevent such action on the part of these officials.

The chief point relied on in the petition for injunction is that the law under which the election was held was not enacted by the General Assembly in the manner required by the Constitution; the allegation on that behalf being, in effect, that, on the final passage in the Senate of the bill, as amended in the other House, the vote was not taken by yeas and nays and entered in the journal as required by section 46 of the Constitution.

A consideration of other points relied on will be deferred until after disposition of the principal question.

It is conceded that the bill, properly enrolled, was signed by the presiding officer of each of the two Houses, and signed and approved by the governor.

The question is, can a law thus promulgated be impeached by reference to the journals of either House?

Different answers have been given to this inquiry in various courts of last resort in this country, but in this State it remains substantially unanswered; for whatever may be said of the argument of the question in the World's Fair Case (Norman, auditor v. The Kentucky Board, &c., 93 Ky., 537), we are not to take the case as decisive of that which it expressly disclaims to decide. After a discussion tending, it may be admitted, to the conclusion that such an impeachment might be had, the majority opinion yet determines it to be unnecessary to decide the question, and the plaintiffs seeking to recover under a law sought to be so impeached were there denied relief on grounds not pertinent to this inquiry.

It is to be observed, at the outset, that this is not a case where the enrolled bill is supposed to be in anywise different

from the bill actually adopted by the legislative body.

It is not a dispute over contents. Such a question is presented in many of the cases. Thus in Field v. Clark, 143 U. S., 649 (1891), the allegation was that a section of the bill, as it actually passed, was not in the enrolled bill as authenticated by the signatures of the presiding officers, and deposited with the Secretary of State. And so in State v. Town Council of Chester, 39 S. C., 307 (1893), the contention was that the original bill, which was sent from the Senate to the other House, was altered by the Speaker of the House of Representatives at the time or after it passed that House, and amended as he saw fit, when the journals of the House showed no such alterations.

These cases, and we note them here as samples of many others to the same effect, hold that the official attestation of the presiding officers of the legislative bodies and of the executive are conclusive that an act so authenticated is the very act passed by the body, and leave undetermined, in express terms at least, the further question whether an act may be impeached if the journals fail to show that which the Constitution expressly requires them to show; such as that the bill was passed by a yea and nay vote.

An examination of these cases, however, shows that the argument against the use of the journals to show that the bill was not the same as that actually adopted is quite conclusive against their use to show the absence of the steps contemplated by the organic law.

And we may observe in this connection, it would be strange if it were otherwise; for why should the journals, if deemed capable of shedding light on any question touching the bill, be rejected as evidence affecting the substance (the

very bill itself) and held competent to effect the mere steps in the process of passing it?

Indeed, does there not seem to be stronger reasons for seizing hold of the journals to expose the fraud of promulgating as valid a law which had in fact never passed at all, than for using them to undermine a law because of flaws in the steps taken during its passage?

Manifestly, therefore, the case of Field v. Clark, and the numerous decisions of the State courts, which have gone to the extent, and no further, because the particular case did not demand it, of holding the journals incompetent to declare the enrolled bill not to be the very one adopted by the legislative body, must be classed with a few exceptions, along with the authorities holding that the verity of the enrolled bill, when duly certified and authenticated by the presiding officers, is absolute and conclusive.

So construing these cases, it becomes palpable that the overwhelming weight of authority is against the impeachment of the enrolled bill by the journals whether in a matter affecting the contents of the bill, or merely the regularity of the steps taken in its passage.

When we look to the argument, much may be said on either side of the question, and we shall content ourselves with suggesting only a few of the controlling reasons for our opinion.

In the first place, no court can begin its scrutiny of the manner in which the legislative department may have performed the details of its work, as shown by its daily journals, without a sense of assumed superiority, or without seeming to arrogate to itself a supervisory power wholly inconsistent with the fundamental truth that the departments

are equal and independent in their respective spheres. Surely must the passing of bills, and all the accompanying minutia, be exclusively legislative processes. Courts do not make laws or pass bills; and the various steps required by the organic law taken seem, in the nature of things, to call for the exercise of legislative and not judicial functions.

The judiciary, at every step of its investigation into the journals of a legislative body, must find itself confronted with the embarrassing question, how is it that the courts have come to be the exclusive guardians of those mandatory provisions of the Constitution which direct the legislature only how to transact its business?

The answer must be more embarrassing because such a thing can not be except on the assumption that the courts must regard themselves as alone competent for such oversight.

It is to be admitted that unless the constitutional mandate is followed "no bill can become a law." The Constitution so says. But the question remains, what shall be taken by the courts as the basis of judicial knowledge? Must they look to the journals and accept as conclusive the hasty memoranda of the clerk or his assistant, or shall they assume that the legislature obeyed the Constitution and accept as conclusive the certifications of its presiding officers?

That the act or successive acts of some agency somewhere or somehow must be held conclusive is entirely evident, unless we open the doors to all competent proof, including that of the member on the floor, an absurdity not to be thought of. The result is we must accept as conclusive either the entries of the clerk in the journals or the more deliberate acts of the presiding officers.

It must be conceded on all sides that at least some of the directions of the Constitution prescribing steps to be taken in the passage of a bill are addressed primarily if not exclusively to the legislature.   Thus no bill shall be considered for final passage unless the same has been reported by a committee and printed for the use of the members.   Every bill shall be read at length on three different days in each House.   (Section 46.)   And so before the presiding officer of each House shall have affixed his signature to any bill he shall suspend all other business, declare that such bill will now be read, and that he will sign the same to the end that it may become a law.   The bill shall then be read at length and compared, and if correctly enrolled the presiding officer, in the presence of the House in open session, and before any other business is entertained, affix his signature, which fact shall be noted in the journal, and the bill immediately sent to the other House.   When it reaches the other House the presiding officer thereof shall immediately suspend all other business, announce the reception of the bill, and the same proceedings shall thereupon be observed in every respect as in the House in which it was first signed, and thereupon the clerk of the latter House shall immediately present the same to the governor for his signature and approval. (Section 56.)

Can it be said that a statute has not become a law if the journals show it was not reported by a committee or printed for the use of the members, or read at length on three different days, or was signed by the presiding officer without a suspension of all other business, and when no entry appears in the journals noting such signature?   At least some of these steps are especially required to be entered in the jour-nal, and nearly all of them ought to appear there if the

Houses keep a journal of their proceedings, as required by section 40 of the Constitution.

In some of the courts, where the journals are held to be competent evidence to impeach the enrolled bill, it is said that where those records are merely silent the presumption is absolute that the required steps were in fact taken. This seems to us hardly logical. If the validity of a law is to rest at all on the entries in the journals, it seems to us when there is a total absence of evidence that a necessary step has been taken, the superstructure—the law—thus built up without a foundation must fall.

Those courts assume that the failure of the clerk to make the entry and in this violate the Constitution requiring the entry to be made was an oversight or mistake, and treat the entry as made, supplying the omission, and yet are not willing to assume it to be a mistake or mere misapprehension of the inferior officer, if an entry is made, showing steps taken not in conformity with the constitutional requirements.

Even if resort is had to the journals it would seem as consistent to overlook the sins of commission by the clerk and treat his entry showing a violation of the Constitution as not true as to overlook his sins of omission and supply the defects in his record. To avoid the necessity of resorting to these fine-spun distinctions we are convinced that the consistent and safe rule is to assume that the legislature, in obedience to the Constitution, has taken the steps required by that instrument in the passage of every law, attested by the signatures of its presiding officers, the journals to the contrary notwithstanding.

The enrolled bill, so attested and signed and approved by the Executive, is easy of access and inspection, but what shall we say of the journals? At the session at which the

law now under consideration was adopted those records consist of over 4,000 pages. They seem to have been hurriedly and imperfectly indexed, as in the nature of things they must ever be. The assiduous lawyer who plods through these volumes may fail to find the evidence of an important step required by the Constitution to support a statute which has been promulgated as the law of the land, and the court in this case declares as a matter of fact that the *prima facie* law so promulgated is not, in fact, the law. In an adjoining circuit the court is more fortunate, and the missing step is found, or the erroneous entry is found corrected elsewhere in the record. So the law is upheld, and this confusing result will be reached, not because the law depends on the testimony or the pleadings in any given case, for the courts must take judicial notice of the journals, if they are controlling, as well as of the signatures of the presiding officers, if these are to be held conclusive; but the confusion comes from the nature of the record to be inspected. This is usually prepared by the subordinate officers hurriedly, amidst the excitement and confusion incident to legislative bodies, and with small concern for those details which are to become so important if the record is to be subjected to judicial scrutiny.

But it is said, since the Constitution requires the journals to be kept, it must be because they are to be used as evidence of legislative compliance or noncompliance with the constitutional requirements. We can see, however, much use for these journals other than the one suggested. Besides being necessary for the conduct of the business, it is to be remembered that our government is a representative one, and the journals show the respective parts borne by each representative in the enactment of the laws and the conduct of the

public business.    Responsibility can not be shifted or made to rest on the body as a whole.    We know that the enrollment of bills receives careful attention at the hands of special committees for that purpose.    It is the final act of the body, the climax of the work before the finishing hand of the presiding officer sets his approval thereto.    It receives and merits attention for that reason, and there is small room for imposition or fraud.    The enrolled act is well nigh necessarily the very act passed by the body, but the chances of mistake are very great in the make-up of the journals, as they are ordinarily kept, and if it be understood that the enrolled bill may be impeached by them the chances of fraud are likewise great.    They are usually read from loose sheets or hurriedly made memoranda, and are approved with slight attention, are then passed to the journal clerk or some copyist, to be transcribed formally in the journal.    They receive usually no further consideration at the hands of the body.

In after years the careless omission of a name on the affirmative side of a law, requiring a certain number of votes is made the basis of a judicial finding that the law has not been enacted by a constitutional majority.

This feature is well put in the recent case of State *ex rel* Reed v. Jones Co., 6 Washington, 468 (1893), where it is said: "Unless the method of keeping journals should at once be revolutionized, and so much attention be paid to them that they will be made to absolutely represent all the doings of the body to such an extent as to very much prolong the sessions of the legislature, the sanctity of legislative enactments will be entirely dependent upon the carefulness and good faith of some copyist employed by the legislature at a few dollars a day."

The same point is thus stated by Justice Harlan in Field

v. Clark: "The evils that may result from the recognition
of the principle that an enrolled act, in the custody of the
Secretary of the State, attested by the signatures of the pre-
siding officers of the two Houses of Congress and the approv-
al of the President, is conclusive evidence that it was passed
by Congress, according to the form of the Constitution,
would be far less than those that would certainly result
from a rule making the validity of congressional enactments
depend upon the manner in which the journals of the re-
spective Houses are kept by the subordinate officers charged
with the duty of keeping them."

It is said, however, that such a conclusion results in leav-
ing the legislative department free to nullify the plain pro-
visions of the Constitution, and refuse to comply with the for-
malities required by that instrument in the enactment of the
laws. If this is true it does not follow that the courts may
interfere with the processes of the legislature in that re-
spect. If that department fails or refuses to do the bidding
of the Constitution it is responsible to the people and not to
the courts. Besides, an assumption that it will so fail or re-
fuse is not to be made the basis of judicial action. To the
argument that if the authenticated roll is conclusive upon
the courts, then less than a quorum of each House may, by
the aid of corrupt presiding officers, impose laws upon the
State in defiance of the inhibition of the Constitution,
the Supreme Court of Indiana, in Evans v. Brown, 30
Ind., 514, responded thus: "It must be admitted that the
consequence stated would be possible. Public authority
and political power must of necessity be confided to officers,
who, being human, may violate the trusts reposed in them.
This, perhaps, can not be avoided absolutely, but it applies
also to all human agencies. It is not fit that the judiciary

should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise co-ordinate departments, and correct or prevent abuses of their authority. It can not authenticate a statute. That power does not belong to it, nor can it keep the legislative journal. It ascertains the statute law by looking at its authentication, and then its function is merely to expound and administer it. Nor is there any great force in the argument which seems to be regarded as of weight by some American courts that some important provision of the Constitution would be a dead letter if inquiry may not be made by the courts beyond the rolls. This argument overlooks the fact that legislators are sworn to support the Constitution, or else it assumes that they will wilfully violate that oath. It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim that the judiciary only will be faithful to its obligation."

From every point of reason, therefore, we are convinced that the enrolled bill, when attested by the presiding officers as the law requires, must be accepted by the courts as the very bill adopted by the legislature, and that its mode of enactment was in conformity to all constitutional requirements. When so authenticated it imports absolute verity and is unimpeachable by the journals.

When we look to the authorities we find, as indicated before, a great diversity of opinion. They are too numerous to be reviewed here. We notice, however, that the more recent cases are adopting the English rule, and holding the enrolled bill conclusive. In several of the cases where the courts felt constrained to follow their former rulings, hold-

ing the journals competent, regret is expressed that a different rule had not prevailed. (State v. Moore, 37 Neb., 13.) Others express a doubt whether it is the better rule, and in South Carolina the court overrules its former decisions and adopts the views expressed in Field v. Clark. (State v. Town Council of Chester, 39 S. C., 307.)

In the recent case of Carr v. Coke, 116, N. C., 223 (1895), the question was considered as one of new impression in that State, and, after what seems to us a very satisfactory course of reasoning and a review of the principal authorities, the conclusion was reached that "when the legislature has solemnly certified to a fact, that is to the passage and ratification of an act which is within its own sphere," the judiciary will not be permitted "to inquire into or dispute that certification."

To the same effect is the case of Hardee v. Wentworth, 42 Pacific Rep., 1028 (Arizona, 189). The opinion in this case is well considered, and the doctrine restated on principle and authority. See also the recent cases of Lyons v. Woods, 153 U. S., 649; State v. Nye, 42 Pacific Rep., 856 (Nev.); Hunt v. Wright, 70 Miss., 298; Hollingsworth v. Thompson, 12 Southern Rep., 4; 45 L. A., 222; State v. Boyce, 40 N. E. R., 113 (Ind.), and Western Union Telegraph Co. v. Taggart, 40 N. E. R., 1051.

The older authorities are found collected in the notes to Field v. Clark, and the Washington & North Carolina cases cited, and need not be further discussed.

Regarding, therefore, the act of August, 1892, as constitutionally enacted, it is yet insisted by the appellees that as prior to January 31, 1894, when the vote in the town of Berry was taken, a special prohibitory law (1884) was in force in the magisterial precinct that included the town; therefore,

no vote in the town alone could undo the vote of the entire precinct, and that the same subdivision which voted out the sale must act to vote it in.

The case of King, &c., v. Commonwealth, 86 Ky., 436, is relied on to support this contention. But in that case the right claimed by the town to take a separate vote was confessedly derived from the same law which conferred a similar right on the precinct which included the town. The power given each subdivision was from the same source, and was simultaneously conferred. Hence the conclusion was reached that no greater but equal power was conferred on each, and when the whole acted under the general law the part could not undo what it had done. But here we have a new political division created and new powers conferred. A complete separate entity is erected by a new charter of the town of Berry, and the trustees thereof given exclusive control of the question at hand except they can not grant license when forbidden by a previous law until the law is changed. And as showing that such a change might be had and how, we have only to quote a provision of the charter on that subject, adopted in July, 1893, to-wit: "That in any town of the sixth class, in which the question as to whether spirituous, vinous and malt liquors might or should be sold shall hereafter be submitted to the voters thereof, and the majority of votes cast thereat shall be in favor of the sale of such liquors therein, then the said board of trustees of such town shall have no right, power, privilege or discretion to refuse to grant licenses to sell such liquors therein, until another election is held therein, as provided by general laws, and a majority of the voters of said town have voted against the sale of such liquors." (Subsection 4, section 3704, Kentucky Statutes.)

A vote in the new territory was, therefore, clearly contemplated and authorized by this charter, and, moreover, the general law—the local option law—was adopted to the end that consistent and uniform laws should prevail everywhere in place of these various and irregular special acts. Such was our conclusion in the recent case of McTigue v. Commonwealth.

Of course the same precinct in which the vote was originally taken can never have another vote taken. It is well known that both the magisterial and voting precincts of 1884 have long since been obliterated and new ones erected (Kentucky Statutes, sections 1078, 1443), and it is even doubtful if a special act of the Legislature could be constitutionally enacted, as where a general law can be made applicable a special one shall not be enacted.

Nor do we find any difficulty in determining the appellants to have been the trustees of the town of Berry at the time of the institution of this suit. They had been regularly elected under the old charter for one year from April, 1893, and while section 167 of the Constitution provided for a termination of their offices at the November election, 1893, it provided that the old officers should yet hold until their successors should be elected and qualified.

In the Wilson-Johnson case, 95 Ky., 415, the successor of the old officer was in fact elected at the November election, 1893, and the old officer was not entitled to hold thereafter. In answer to his contention that he might so hold over, we said: "It is true he was to hold until the general election in November, 1893, *and* until his successor was elected and qualified, but this is the usual method provided to prevent a vacancy, when from some unforeseen circumstance no election has been held at the regular time,

or some time must elapse until the succeeding officer shall qualify and be inducted into the office."

Here there was no election held in the town of Berry in November, 1893, and under the express terms of the Constitution the appellants were entitled to hold over, and were, therefore, not usurpers, as contended by appellees.  The act of March, 1894 (section 3672, Kentucky Statutes), was passed to cure any possible doubt of the legality of the acting trustees of towns of the sixth class, arising out of the failure of many of those towns to elect trustees in November, 1893, and was not enacted, as contended by counsel, in recognition of the alleged fact that there were vacancies in those offices, or that the acts of the hold-overs were void.  Such a legislative declaration, if made, would have been inoperative as an unauthorized interference with the functions of the judiciary in the exercise of its exclusive right to construe and interpret the laws.

We conclude, therefore, that upon none of the grounds relied on are the appellees entitled to the relief granted by the perpetuation of the injunction, and the judgment below is reversed with directions to dismiss the petition.