[Criminal No. 335. Filed April 4, 1913.]

[130 Pac. 1114.]

# WOOD ALLEN, Appellant, v. STATE OF ARIZONA, Respondent.

1. STATUTES — ENACTMENT — REFERENDUM — CONTROL.—Under Laws of Special Session of 1912, chapter 71, section 3, providing a method of testing the sufficiency of initiated and referred petitions, and empowering the court to enforce or restrain action on the part of the administrative officers as the merits of the case demand, the courts have power, at the instance of any citizen, after the filing of a referendum petition, on a proper showing, to confine and regulate the administrative acts of officers, so as to obtain a proper submission of the question raised according to law.

2. STATUTES—REFERENDUM—"REGULAR GENERAL ELECTION."—Constitution, article 4, section 1, subdivision 10, provides that when a referendum petition shall be filed, the Secretary of State shall cause to be printed on the official ballot at the next regular general election the title and number of the measure, together with the words "Yes" and "No," in such manner that the electors may express at the polls their approval or disapproval of the measure. Laws of Special Session of 1912, chapter 24, section 1, provides for a general election of representatives in Congress and of state, county, and precinct officers on the first Tuesday after the first Monday in November, 1912, and on the same day of every even-numbered year thereafter; and section 2 authorizes the election of presidential electors at the election so held on the first Tuesday after the first Monday in November, 1912, and quadrennially thereafter. Held, that, though chapter 24 was invalid, in so far as it provided for the election of state, county, and precinct officers in 1912, it was nevertheless valid and provided for a general election, so far as it authorized the election of representatives in Congress and presidential electors in that year, and hence was the "next regular general election," to which a referendum petition filed September 20, 1912, should be submitted to voters.

3. CONSTITUTIONAL LAW — ADOPTION OF STATUTE — REFERENDUM — PUBLICITY—REVIEW.—Where a statute passed by the legislature has been submitted to and adopted by referendum vote, it is against public policy for the court, on a subsequent review, to declare it invalid because it has not received the publicity required by law before the election.

4. STIPULATIONS—VALIDITY—MATTERS NOT SUBJECT TO STIPULATION.— On an issue as to whether a statute has been legally submitted to a

referendum vote of the people, the parties cannot stipulate as to the facts attending such submission, and from such stipulations ask the court to determine the validity of the law.

5. CONSTITUTIONAL LAW—VALIDITY OF STATUTE—REFERENDUM—DEPARTMENTS OF GOVERNMENT—INFRINGEMENT.—Under the constitutional provisions separating the legislative from the judicial department of government, where a statute appears on its face to have been properly passed by the legislature, signed by the governor, and referred to the people pursuant to a referendum petition, and the governor has issued a proclamation showing that the statute has been approved by the majority of those voting thereon, and declaring the measure a law, the courts have no power to go behind the final legislative record and the governor's proclamation, and hold the law invalid for failure to comply with some constitutional provision regulating its passage.

APPEAL from a judgment of the Superior Court of the County of Maricopa. J. C. Phillips, Judge. Affirmed.

The facts are stated in the opinion.

Mr. W. L. Barnum and Messrs. Frank Cox, Chalmers & Kent, and F. C. Struckmeyer, *Amici Curiae*, for Appellant.

Mr. G. P. Bullard, Attorney General, and Mr. Leslie C. Hardy, Assistant to the Attorney General, for Respondent.

PER CURIAM.—The appellant was tried, convicted, and fined in the superior court of Maricopa county upon the charge of violating the game law, by killing, on December 15, 1912, a quail without first having obtained a hunting license as required by section 21 of chapter 82, Session Laws of Special Session, First Legislature. The appellant demurred to the information for the reason, as he contends, that chapter 82 is not a valid and subsisting law. He admits the fact of killing the quail, but asserts there exists no law making the act a crime.

The session of the legislature at which chapter 82 was passed and approved adjourned June 22, 1912. "But to allow opportunity for referendum petition," it is provided in subdivision 3, section 1, article 4, of the constitution, that "no act passed by the legislature shall be operative for ninety days after the close of the session of the legislature enacting such measure. . . . " Further provisions of the same article

of the constitution are that five per centum of the qualified electors who voted for all candidates for governor at the general election last preceding the filing of any referendum petition may order the submission to the people at the polls any measure, or item, section, or part of any measure, enacted by the legislature, by filing such petition with the Secretary of State not more than ninety days after the final adjournment of the session of the legislature which shall have passed the measure to which the referendum is applied. On September 20, 1912, a petition for referendum on chapter 82 was filed with the Secretary of State, which had the effect of referring said measure to a vote of the qualified electors of the state for their approval or rejection at the next regular general election.

The right of the people to pursue this course with reference to chapter 82 is vouchsafed them by subdivision 1, section 1, article 4, of the constitution, which reads as follows: "The legislative authority of the state shall be vested in a legislature, consisting of a Senate and a House of Representatives, but the people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any act, or item, section, or part of any act, of the legislature." In this case the people have undertaken to exercise their option of approval or rejection upon the whole of chapter 82. They filed the required referendum petition with the Secretary of State within the time allowed by law. Having done this, clearly they are entitled to be heard in the proper manner, time, and place. The manner in which they are to be heard is by their votes, the place is at the "polls," and the time is at the "next regular general election." The measure was submitted to the qualified voters of the state at the election held on the first Tuesday after the first Monday in November, 1912. That the people were heard at such election is attested by their votes; 19,455 voters, out of a total registration in the state of 24,907, voted for or against the measure. That the votes of the electors were cast at the "polls" in the manner provided by law is unquestioned. It is obvious that the great *desiderata* of the constitution in reference to initiated and referred measures

were a full expression *pro* and *con* of the whole electorate at
the proper time, manner, and place.

The constitution, in aid and to facilitate the exercise of
the power reserved by the people "for use at their option to
approve or reject at the polls any act," named certain officers
of the executive department of the state as agencies through
and by whom this power was to be directed. One thing only
is required of the proponents of a referendum, and that is
to file a proper and legal petition with the Secretary of State,
and only one thing is permitted or required of the electorate,
and that is to vote on the measure at the time of its submis-
sion. The duty to file the referendum petition and refer the
measure to a vote of the qualified electors is devolved upon
the Secretary of State. Const., art. 4. It is made his duty
to give the measure the prescribed publicity (subdivision 11,
section 1, article 4, constitution, and chapter 71, Session
Laws of Arizona, First Special Session of First Legislature),
and it is his duty to canvass the votes for and against each
measure submitted. In fact, all the details of submitting the
measure from the time of filing the referendum petition to
the canvassing of the vote thereon are largely in the control
and charge of the Secretary of State. The voter cannot
direct what he shall do or not do. He can start the election
machinery, but cannot direct its operation.

But the appellant objects, first, that the measure, chapter
82, was not submitted at a proper or legal election; and, sec-
ond, that it was not given the publicity provided in the con-
stitution and the laws, and therefore is null and void. If
objections had been made in the early stages of the process
of submission for the reasons now assigned, the questions would
have been subjects of judicial investigation and determination.
Section 3, chapter 71, Session Laws of Special Session of
1912, provides the legal method of testing the sufficiency of
initiated and referred petitions, and empowers the courts to
enforce or restrain action upon the part of the administrative
officers as the merits of the case demand; and this power of
the courts may be invoked by any citizen of the state. If
the measure, as it is now contended, was to be submitted to
the voters at the wrong election, or if, as is now urged, it was
impossible to give the measure the publicity required, the
courts were open to any citizen, and possessed the power, upon

a proper showing, to confine the administrative acts of officers within the law. Timely appeal to the courts upon the questions now raised, if meritorious, would have settled the matter before the election was had. However, the measure was submitted to the voters without question. They were invited to believe that the formalities of the law pertaining to the submission of the measure had been fully met. The expense of the election was incurred, and the electors, imbued with the conviction that they were performing one of the highest functions of citizenship, and not going through a mere hollow form, we may assume, investigated the question and went to the polls and voted thereon.

All the qualified voters of the state being authorized to participate in the rejection or approval of referred laws, it may be conceded to be essential that they give expression to their wishes at a time fixed by the fundamental law, just as it may be conceded that it is a primary requisite to the enactment of laws that there be a legal legislature. In time and place, the members entitled so to do must lawfully convene. So the electors qualified to vote on any measure referred to them must lawfully assemble at the time fixed by law to cast their votes. Subdivision 10, section 1, article 4, constitution, provides that the Secretary of State "shall cause to be printed on the official ballot at the next regular general election the title and number of said measure, together with the words 'Yes' and 'No' in such manner that the electors may express at the polls their approval or disapproval of the measure.''

The election at which this measure was submitted was the election provided for by sections 1, 2, and 3, chapter 24, Special Session of 1912. Those sections are as follows:

"Section 1. There shall be a general election of Representatives in Congress, and of state, county, and precinct officers on the first Tuesday after the first Monday in November, 1912, and on the same day of every even numbered year thereafter.

"Sec. 2. Such number of presidential electors as shall equal the number of United States Senators and Representatives in Congress from Arizona shall be elected at an election to be held on the first Tuesday after the first Monday in November, 1912, and quadrennially thereafter.

"Sec. 3. Such elections shall be held under the provisions of the Revised Statutes of Arizona of 1901, and amendments thereto, relating to elections, subject to the provisions thereof."

In *State* v. *Osborne, ante,* p. 185, 125 Pac. 884, we held that chapter 24, in so far as it provided for the election of state, county, and precinct officers in 1912, was in conflict with section 11, article 7, of the constitution, but we did not hold it wholly incompatible. On the contrary, we expressly held it to be valid legislation, in so far as it provided for an election of Representatives in Congress and presidential electors. In that connection we said: "The act also provides for the election for a Representative in Congress and for presidential electors. But this part of the act is not so inseparably connected in substance with the other parts of the act as to work the destruction of the whole act. Striking out the provision for the election of state, county, and precinct officers, the act is capable of being carried out in accordance with the legislative intent as to the election of Representatives in Congress and presidential electors in the year 1912."

It is apparent that the elections mentioned in sections 1 and 2 of chapter 24 are one and the same election, to be held at the same time and places with the same election officers. Section 3 refers to the general election laws (title 20, Revised Statutes of Arizona, 1901) for the manner, method, and machinery for the conduct of the election. Paragraph 2272 provides for the election of delegate to Congress at the general election, as does chapter 24, *supra,* the election of Representative in Congress at the general election. Section 12, article 22, of the constitution, provides that a Representative in Congress shall be elected at the same election at which officers are elected under the enabling act and thereafter at such times and such manner as may be prescribed by law. The term of the Representative in Congress elected under the enabling act expired with the Sixty-second Congress, and it was imperatively necessary that the legislature provide the machinery for the election of his successor. This the legislature did in section 3, chapter 24, and while it was not necessary for the legislature to name the day of the election, this being the duty of Congress already exercised, it did, conform-

ing with the laws of the United States, name the day and designate the election "a general election."

Section 11, article 7, of the constitution, designates the biennial election to be held on the first Tuesday after the first Monday in November "a general election," and it is none the less "a general election" because some of the officers therein mentioned are not voted for. An election for Representative in Congress and presidential electors is a general election in fact, because it is state-wide, permitting all qualified voters to vote, and because it is so named by both the organic and statutory law. The phrase "next regular general election" occurs but the one time in the constitution. "A general election," and "the general election last preceding," and "the last preceding general election," "first general election thereafter," and "general state election" occur. We are not now concerned as to whether these varied expressions describe the same kind of an election, or different elections. Suffice it to say that the election at which chapter 82 was submitted was the "next regular general election" held after the referendum petition was filed against it in the office of the Secretary of State. "In the case of any particular statute, the construction can be determined only by considering the context in which the word is found, the purpose of the statute, and the object which it was designed to fulfill. The next regular election may mean the next election at which officers are to be regularly elected, or it may merely be used to exclude special elections, or it may be used synonymously or interchangeably with the word 'general.'" *People* v. *Babcock,* 123 Cal. 307, 55 Pac. 1017.

When it is considered that it was the evident purpose of the constitution to give every qualified voter of the state an opportunity to register his approval or disapproval of initiated or referred measures, it becomes apparent that that purpose is fully effected by a reference of such measures to a general state-wide election, and we therefore conclude that "regular general election," in this instance, should be construed to mean the same as general election. We thus find that the people, who are the source of all power, in a proper manner, by their votes, at a proper place, at the polls, and at a proper time, a general election, have registered the public will upon chapter 82 and placed thereon the seal of their approval.

This brings us to the second contention of appellant, wherein he asserts chapter 82 did not receive the publicity provided by law. From the view we take of this question, we deem it unnecessary to discuss what the law requires in that regard. Nor do we propose to go into the details of what was done or not done by the administrative officers in the matter of giving publicity to the measure. We believe that we are precluded from doing so on grounds of sound public policy, logic, reason, and by the law itself. The issue in this case is not as to the construction, meaning, or scope of the act, nor whether it be void for its repugnancy to the constitution. So far as the constitution and the act are concerned, it is not contended that there is any incompatability with each other. But we are requested to hold that such enactment, in the form of a statute, was never passed, or, to be more accurate, was never legally referred to the qualified electors for their approval or rejection, so as to become, under the state constitution, a law. And we are asked to determine whether the act before us is a valid and subsisting law of this state by virtue of stipulation and admissions made by the parties at the trial as to what did or did not occur during the progress of its submission to the people and before the proclamation of the governor declaring it to be law.

The Secretary of State, as a subordinate administrative officer of the government, was charged by the constitution with the duty of submitting the measure to the voters for their approval or rejection. He is not a party to this action, and what the parties to it may agree as to his action in the premises is not binding on him. We are of the opinion that they cannot stipulate as to such matters, and from such stipulations ask the court, in a given case, whether a law is or is not in force. So, in deciding the issue, we shall not regard the stipulation or admissions made by the parties to the action. If we were bound by such stipulations, the judgments of the courts in such matters would be as different as the facts agreed upon by parties in different actions might vary.

In the case of *Pacific R. R.* v. *Governor,* 23 Mo. 353, 66 Am. Dec. 673, the court used this language: "Whilst the power of the courts to declare a law unconstitutional is admitted on all hands as being necessary to preserve the constitution from violation, yet such power is claimed and exercised in relation

XIV Ariz.—30

to laws which show on their face that the constitutional limits have been transcended. The reason of this principle limits the claim of jurisdiction to such cases. The constitution is designed to limit the powers of the government, and confine each of the departments to its appropriate sphere. If the legislature exceeds its powers in the enactment of a law, the courts, being sworn to support the constitution, must judge that law by the standard of the constitution and declare its invalidity. But the question whether a law on its face violates the constitution is very different from that growing out of the noncompliance with the forms required to be observed in its enactment. In the one case a power is exercised, not delegated, or which is prohibited, and the question of the validity of the law is determined from the language of it. In the other, the law is not, in its terms, contrary to the constitution; on its face it is regular, but resort is had to something behind the law itself in order to ascertain whether the General Assembly, in making the law, was governed by the rules prescribed for its action by the constitution. This would seem like an inquisition into the conduct of the members of the General Assembly, and it must be seen at once that it is a very delicate power, the frequent exercise of which must lead to endless confusion in the administration of the law.''

In *State Lottery Co.* v. *Richoux,* 23 La. Ann. 743, 8 Am. Rep. 602, it was said by the court: ''When a legislative act is duly promulgated according to the constitution and laws under which it is passed, we find no authority in the judiciary department to look behind it and determine its validity or invalidity from the proceedings of the General Assembly in adopting it. Such a course, it would seem, is not sustainable on the theory of the independent and separate action of the three branches of the State government. When a legislative act is attacked on the ground that it contains provisions that are unconstitutional, the question of its validity is properly within the scope of judicial action. The courts have power, when a constitutional question is raised, to examine whether the thing ordered, permitted, or forbidden to be done may have effect under the sanction of the constitution. The question should be, is the law itself constitutional as to its provisions and what it declares, and not whether it is con-

stitutional as to the manner of its enactment or the proceedings by which it was enacted?''

. So the doctrine of constitutional law, treating of the power of the courts to declare statutes void because in conflict with the constitution, must not be confounded with the want of power in the courts to go behind the record of a duly authenticated and enrolled statute, and receive evidence, documentary or parol, to impeach such record and nullify the act. Article 3 of our constitution, relating to the distribution of powers, provides: ''The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; and, except as provided in this constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.''

All political power is inherent in the people, and governments derive their just powers from the consent of the governed. This is not a mere metaphor, that sounds pleasing to the ear, nor is it a maxim that may not have a concrete application; but it is a vital principle, adhered to in the formation of the government of this state. By their constitution, the legislative authority was vested in a legislature, consisting of a Senate and a House of Representatives; but the people reserved the power to propose laws and amendments to the constitution, and to enact or reject such laws and amendments at the polls, independently of the legislature, and they also reserved, for use at their own option, the power to approve or reject at the polls any act, section, or part of any act of the legislature. The people did not commit to the legislature the whole law-making power of the state, but they especially reserved in themselves the power to initiate and defeat legislation by their votes. In this state the legislature and the people constitute the law-making power. This is important when we come to consider the adjudicated cases holding that if the enrollment or original record of the statute is regular on its face—that is, if the act is framed with no infirmity on its face, is duly promulgated, or properly authenticated and deposited in the proper office—it is conclusively presumed to have been regularly enacted, the record is invulnerable to attack, and proves itself. If such sanctity and verity may be given to the acts of the delegated representatives of

the people in legislative body assembled, it must with clearer reason and with greater force be given to the act of the sovereign itself, the source of all governmental power, the record of which, in its law-making capacity, is authenticated and promulgated as the constitution provides.

Subdivision 5 of section 1 of article 4 of the constitution provides: ''Any measure or amendment to the constitution proposed under the initiative, and any measure to which the referendum is applied, shall be referred to a vote of the qualified electors, and shall become law when approved by a majority of the votes cast thereon and upon proclamation of the governor, and not otherwise.'' In the case at bar we have an act of the legislature deposited in the office of the Secretary of State, the legal custodian of the laws. The act is authenticated by the signatures of the Speaker of the House of Representatives and the President of the Senate, with the approval of the governor thereon. There is also the proclamation of the governor, giving the whole number of votes cast for and against such measure on a referendum thereof to the people, showing it to be approved by a majority of those voting thereon; the governor declaring in such proclamation the measure to be law.

It does not follow, from the power of the courts to declare statutes unconstitutional, that they can go behind authenticated and approved statutes for the purpose of inquiring whether those statutes were passed in the manner prescribed by the constitution. Whether the courts have this power to receive other evidence, in order to ascertain whether the law-making power has conformed to constitutional requirements, has been many times before the courts of this country, and has met with no little difference of opinion. It is held by one line of cases that a duly authenticated, approved, and enrolled statute imports absolute verity, is conclusive that such an act was passed in every respect as designated by the constitution; and, by another, that while such authentication, approval, and enrollment are strong *prima facie* evidence that it was passed, still this presumption may be overcome by proper evidence. If the question were one of first impression in this jurisdiction, we would be persuaded to adhere to the doctrine announced in that class of cases holding that a duly enrolled and authenticated statute, regular on its face, is conclusive of the

fact that it was regularly passed, and that the courts cannot go behind it and entertain evidence by which it may be impeached. Wherever the question is one of first impression, this rule is generally adopted, while in some states the courts continue to follow earlier precedent, and adhere to the contrary view, but this is not always the case, however, as the overruling of earlier cases is somewhat common.

That the question is not one of first impression in this jurisdiction we cite *Graves* v. *Alsap*, 1 Ariz. 274, 25 Pac. 836, and *Harwood* v. *Wentworth*, 4 Ariz. 378, 42 Pac. 1025. In the latter case the court said: "For a court to permit evidence to impeach an act which purports to have passed the legislative assembly, attested by the signatures of the presiding officers of the respective houses thereof, approved and signed by the governor, and deposited with the officer who by law is the custodian thereof, without authority by constitutional provisions clearly expressed, would be to destroy the independence of one of the three co-ordinate branches of our government, and make the legislative department subordinate to the judicial." The principle enunciated in the case is further illuminated in an able concurring opinion by Chief Justice Baker. This case, on appeal to the supreme court of the United States, was affirmed by that court in 162 U. S. 547, 40 L. Ed. 1069, 16 Sup. Ct. Rep. 890, upon authority of *Field* v. *Clark*.

The question was first presented to the supreme court of the United States for decision in 1891, as a pure problem of constitutional law. Mr. Justice Harlan, speaking for the court in *Field* v. *Clark*, 143 U. S. 649, 36 L. Ed. 294, 12 Sup. Ct. Rep. 495, in an able opinion, there said: "This question is now presented for the first time in this court. It has received, as its importance required it should receive, the most deliberate consideration. We recognize, on the one hand, the duty of this court, from the performance of which it may not shrink, to give full effect to the provisions of the constitution relating to the enactment of laws that are to operate wherever the authority and jurisdiction of the United States extend. On the other hand, we cannot be unmindful of the consequences that must result if this court should feel obliged, in fidelity, to the constitution, to declare that an enrolled bill, on which depend public and private interests of vast magnitude, and

which has been authenticated by the signatures of the presiding officers of the two houses of Congress, and by the approval of the President, and been deposited in the public archives as an act of Congress, was not in fact passed by the House of Representatives and the Senate, and therefore did not become a law.''

The court, after an exhaustive review of the authorities, reached a unanimous conclusion that an enrolled bill, regular on its face, duly authenticated by the official signatures of the presiding officers of both houses of Congress, is an official attestation by the two houses that such bill has duly and regularly passed Congress; and when the bill thus attested receives the approval of the President, and is deposited in the Department of State according to law, its authentication as a bill that has passed Congress is complete and unimpeachable, and it is not competent to show from the journals of either house of Congress that an act so authenticated, approved, and deposited did not pass in the precise form in which it was thus signed and approved, or that it was not passed in the manner required by the constitution.

We make the following extended quotation from the case of *State* v. *Jones,* 6 Wash. 473, 23 L. R. A. 340, 34 Pac. 201, where the principle is very logically advanced and forcibly stated: ''But it is argued with great force on the part of the respondent that if the courts do not look into the proceedings of the legislature, and set aside laws when not enacted with the formalities required by the constitution, the legislature can at pleasure nullify all such provisions. This is no doubt true, and it is upon this line of reasoning that those courts which have gone behind the enrolled bill have justified themselves in so doing. This line of reasoning seems to assume that the judicial department is charged with seeing that all the mandatory provisions of the constitution are complied with. But is this a reasonable construction, in view of the theory of our government, and the principles enunciated in our constitution? Each of the three departments into which the government is divided are equal, and each department should be held responsible to the people that it represents, and not to the other departments of the government, or either of them. What are the respective duties of these departments? They may be briefly stated thus: The legislature enacts laws,

and is commanded by the constitution to enact them in a certain way. The executive enforces the laws, and by the constitution it is made his duty to take certain steps looking toward such enforcement in the manner prescribed therein upon the happening of certain contingencies. The judicial department is charged with the duty of interpreting the laws, and adjudging rights and obligations thereunder. What is the law upon which the judicial department must thus determine rights and obligations? It is, first, the constitution of the state; second, so much of the common law as is in force here, and the laws of the legislature; and, third, the acts of the executive department in those matters in which, under the constitution, it is given the power to exercise discretion under certain contingencies. Such being the respective duties of the several departments, it seems to us that the acts of each of them, when certified as required by the constitution, or by such a universal course of practice as to have the force of a constitutional provision, should be conclusive upon each of the other departments; and there would seem to be no more impropriety in the legislature seeking to go behind the final record of a court, for the purpose of determining whether or not it had obeyed the constitutional directions in making such a record, than there would be in the courts seeking to go behind the final record made by the legislative department. As we have seen, the executive, under the constitution, is charged with doing certain things upon certain contingencies happening, and under the constitution he is given no power thus to act excepting upon such contingency; yet if the governor determines that such contingency exists, and acts in pursuance thereof, no court, so far as we have been able to see, has ever sought to inquire into the fact as to whether or not the contingency upon which the governor had founded his action in fact existed. For instance, under the constitution, the governor is authorized to convene the legislature upon extraordinary occasions, and there would seem to be the same reason for a court refusing to give force to his proclamation thus convening the legislature, if upon investigation it found that the extraordinary occasion upon which the governor had assumed to act did not in fact exist, as there would be to go back of the record made by the legislature. To preserve the harmony of our form of government, it must be held that

these several mandatory provisions are addressed to the department which is called upon to perform them, and that neither of the other departments can in any manner coerce that department into obedience thereto. Courts have gone behind the final record of the legislative department upon what seems to us a false theory. They have assumed that the mandatory provisions of the constitution are safer if the enforcement thereof is intrusted to the judicial department than if so intrusted to the legislature; in other words, they have acted upon the presumption that their department is the only one in which sufficient integrity exists to insure the preservation of the constitution. How the courts have obtained this idea is somewhat difficult to ascertain, but that they entertain it, and have allowed it to influence their decisions, is so evident that even a superficial examination of such decisions will satisfy any one of the fact.''

In Indiana it is held that the courts cannot look beyond the enrolled act to ascertain whether there has been a compliance with the requirements of the constitution that no bill shall be presented to the governor within two days next previous to the final adjournment. *Bender* v. *State,* 53 Ind. 254.

The doctrine that an enrolled and duly authenticated bill will be conclusively presumed to have been passed in conformity to the requirements of the constitution, as announced in the case of *Sherman* v. *Story,* 30 Cal. 253, 89 Am. Dec. 93, while subsequently departed from by that court, has recently been cited and sustained in the case of *Yolo County* v. *Colgan,* 132 Cal. 267, 84 Am. St. Rep. 41, 64 Pac. 407. In the latter case the court said: ''The law-making power of the state is vested by the constitution in the legislature; and, while the constitution has prescribed the formalities to be observed in the passage of bills and the creation of statutes, the power to determine whether these formalities have been complied with is necessarily vested in the legislature itself, since, if it were not, it would be powerless to enact a statute. The constitution has not provided that this essential power thus vested in the legislature shall be subject to review by the courts, while it has expressly provided that no person charged with the exercise of powers properly belonging to one of the three departments — the legislative, executive, and judicial — into

which the powers of the government are divided, shall exercise any functions appertaining to either of the others."

In Mississippi the subject was thus discussed in *Green* v. *Weller,* 32 Miss. 690: "It may be that legislative acts may be passed without a compliance with the requirements of the constitution. If such defect or violation appear on the face of the act, or by that which constitutes the record, which can be judicially noticed, the power of the court to determine the question is indisputable. But if the proper record shows that the act has received the sanctions required by the constitution, as evidence of its having been passed agreeably to the constitution, and its provisions be not repugnant to the constitution, the regularity and stability of government and the peace of society require that it should have the force of a valid law."

In *Cox* v. *Pitt County,* 146 N. C. 584, 16 L. R. A., N. S., 253, 60 S. E. 516, the court had under consideration the question as to whether proper notice had been given as required by the constitution prior to the enactment of the law in question. It said: "The courts will not go behind the ratification of the act to ascertain whether notice has been given in accordance with section 12, article 2, of the constitution of this state. While that section is binding upon the conscience of the General Assembly, and doubtless is intended to be observed by that body, the courts will not undertake to review the action in that respect of a co-ordinate department of the state government, and will conclusively presume from ratification that the notice has been given."

In *Brodnax* v. *Groom,* 64 N. C. 244, the question was upon a private act requiring thirty days' notice of application, required by article 2, section 4, of the constitution, and the motion was to prove that the notice had not been given. The court, speaking through Chief Justice Pearson, said: "We are of opinion, that the ratification certified by the Lieutenant-Governor, and the Speaker of the House of Representatives, makes it a matter of record, which cannot be impeached before the courts in a collateral way. Lord Coke says: 'A record, until reversed, importeth verity.' There can be no doubt that acts of the legislature, like judgments of courts, are matters of record, and the idea that the verity of the record can be averred against in a collateral proceed-

ing is opposed to all of the authorities. The courts must act on the maxim *'Omnia praesumuntur,'* etc. Suppose an act of Congress is returned by the President with his objections, and the Vice-president and the Speaker of the House certify that it passed afterwards by the constitutional majority; is it open for the courts to go behind the record and hear proof to the contrary?''

In *Carr* v. *Coke,* 116 N. C. 223, 47 Am. St. Rep. 801, 28 L. R. A. 737, 22 S. E. 16, it was held that if a statute, regular on its face and in due form, is ratified and approved by the genuine signatures of the presiding officers of both houses of the legislature, it is conclusive evidence that it was regularly and legally enacted, and the courts cannot go behind this record for any cause to ascertain how such record was established. In a very forcible concurring opinion in this case, Mr. Justice Montgomery said: "I insist that the decision of the court in this case upholds the integrity and independence of one of the coequal departments of the government, and preserves the power and jurisdiction of the two involved in this suit. It is better for us, and will be better for posterity, if in cases where fraud and deceit have been or shall be practiced upon the presiding officers of the House and Senate, by means of which their signatures to spurious bills have been obtained, for the legislature to be convened (if an adjournment was had before discovery), and allowed to correct its own errors or mistakes, than that the court should assume a jurisdiction which does not belong to it, and thereby begin an encroachment upon the rights of the legislative department, to end possibly in judicial tyranny, the basest and the most detestable species of oppression.''

In *Ex parte Wren,* 63 Miss. 512, 56 Am. Rep. 825, the court, in a vigorous opinion, held that the enrolled act, signed by the President of the Senate and the Speaker of the House of Representatives and the governor, is the sole exposition of its contents, and the conclusive evidence of its existence and it is not allowable to look further to discover the history of the act. After a review of the adjudged cases, the court said: "Every other view subordinates the legislature, and disregards that coequal position in our system of the three departments of government. If the validity of every act published as law is to be tested by examining its history, as shown

by the journals of the two houses of the legislature, there
will be an amount of litigation, difficulty, and painful un-
certainty appalling in its contemplation, and multiplying a
hundredfold the alleged uncertainty of the law. Every suit
before every court, where the validity of a statute may be
called in question as affecting the right of a litigant, will be
in the nature of an appeal, or writ of error, or bill of re-
view, for errors apparent on the face of the legislative rec-
ords, and the journals must be explored to determine if some
contradiction does not exist between the journals and the bill
signed by the presiding officers of the two houses. What is
the law to be declared by the court? It must inform itself
as best it can what is the law. If it may go beyond the en-
rolled and signed bill, and try its validity by the record con-
tained in the journals, it must perform this task as often as
called on, and every court must do it. A justice of the peace
must do it, for he has as much right and is as much bound
to preserve the constitution and declare and apply the law
as any other court, and we shall have the spectacle of examina-
tion of journals by justices of the peace, and statutes declared
to be not law as the result of their journalistic history, and
the circuit and chancery courts will be constantly engaged
in like manner, and this court will, on appeal, have often to
try the correctness of the determination of the court below as
to the conclusion to be drawn from the legislative journals on
the inquiry as to the validity of statutes thus tested. . . .
Let the courts accept as statutes, duly enacted, such bills as
are delivered by the legislature as their acts, authenticated
as such in the prescribed mode.''

Chief Justice Beasley, in *Pangborn* v. *Young,* 32 N. J. L.
29, mentions that in the frame of the state government there
are three co-ordinate branches, in all things equal and in-
dependent, each in its sphere the trusted agent of the public;
and it is arrogating an authority, not given to the judiciary,
to inquire into the veracity of the certificate by which the
law-making power authenticates its acts. In the opinion of
the court, the power to certify to the public laws which have
been enacted is one of the trusts of the constitution to the
department of the state government charged with such duty.

The Texas supreme court says: ''Our constitution provides
that, after the passage of a bill, it shall be signed by the pre-

siding officer of each house in presence of the house; and we are
of the opinion that when a bill has been so signed and has been
submitted to and approved by the governor, it was intended
that it should afford conclusive evidence that the act had been
passed in the manner required by the constitution. Such
being the rule of the common law, we think, in the absence of
something in the constitution expressly showing a contrary
intention, it is fair to presume that it was intended the
same rule should prevail in this state. There is no provision
in the constitution indicating in any direct manner such con-
trary intention; and the fact that it is provided that journals
shall be kept and that certain things should be entered therein
we think insufficient to show any such purpose." *Williams*
v. *Taylor*, 83 Tex. 667, 19 S. W. 156.

The Kentucky court of appeals, in a persuasive opinion has
held that the enrolled bill signed by the presiding officers and
approved by the governor was conclusive evidence of its pas-
sage according to the constitution. The court observed:
"That the act or successive acts of some agency, somewhere
or somehow, must be held conclusive is entirely evident, unless
we open the doors to all competent proof, including that of the
member on the floor, an absurdity not to be thought of. . . .
The enrolled bill, so attested and signed and approved by the
executive, is easy of access and inspection; but what shall we
say of the journals? At the session at which the law now un-
der consideration was adopted, those records consist of over
four thousand pages. They seem to have been hurriedly and
imperfectly indexed, as in the nature of things they must ever
be. The assiduous lawyer, who plods through these volumes,
may fail to find the evidence of an important step required by
the constitution to support a statute which has been pro-
mulgated as the law of the land, and the court in this case
declares as a matter of fact that the *prima facie* law so
promulgated is not, in fact, the law. In an adjoining cir-
cuit the court is more fortunate, and the missing step is
found, or the erroneous entry is found corrected elsewhere in
the record. So the law is upheld. And this confusing result
will be reached, not because the law depends upon the testi-
mony or the pleadings in any given case, for the courts must
take judicial notice of the journals, if they are controlling,
as well as of the signatures of the presiding officers, if these

are to be held conclusive; but the confusion comes from the nature of the record to be inspected. This is usually prepared by the subordinate officers hurriedly, amidst the excitement and confusion incident to legislative bodies, and with small concern for those details which are to become so important if the record is to be subjected to judicial scrutiny." *Lafferty* v. *Huffman,* 99 Ky. 80, 32 L. R. A. 203, 35 S. W. 123.

The doctrine we adhere to is affirmed in the following cases: *Lyons* v. *Woods,* 153 U. S. 649, 38 L. Ed. 854, 14 Sup. Ct. Rep. 959; *People* v. *Devlin,* 33 N. Y. 269, 88 Am. Dec. 377; *Hunt* v. *Van Alstyne,* 25 Wend. 605; *People* v. *Commissioners,* 54 N. Y. 276, 13 Am. Rep. 581; *Evans* v. *Browne,* 30 Ind. 514, 95 Am. Dec. 710; *Warner* v. *Beers,* 23 Wend. (N. Y.) 103, 172; *Fouke* v. *Fleming,* 13 Md. 392; *Clare* v. *State,* 5 Iowa, 510; *Duncombe* v. *Prindle,* 12 Iowa, 1; *Eld* v. *Gorham,* 20 Conn. 8; *Weeks* v. *Smith,* 81 Me. 538, 18 Atl. 325; *Bender* v. *State,* 53 Ind. 254; *Narregang* v. *Brown County,* 14 S. D. 357, 85 N. W. 602; *State* v. *Bacon,* 14 S. D. 394, 85 N. W. 605; *Scarborough* v. *Robinson,* 81 N. C. 409; *Underground Cable Co.* v. *Attorney General,* 46 N. J. Eq. 270, 19 Am. St. Rep. 394, 19 Atl. 733; *Freeholders* v. *Stevenson,* 46 N. J. L. 173; *People* v. *Burt,* 43 Cal. 560; *State ex rel. Herron* v. *Smith,* 44 Ohio St. 348, 7 N. E. 447, 12 N. E. 829; *State* v. *Swift,* 10 Nev. 176, 21 Am. Rep. 721; *McLane* v. *Paschal,* 8 Tex. Civ. App. 398, 28 S. W. 711; *Usener* v. *State,* 8 Tex. App. 177, 181; *Donaldson* v. *State,* 15 Tex. App. 25; *Ex parte Tipton,* 28 Tex. App. 438, 8 L. R. A. 326, 13 S. W. 610; *People* v. *Clayton,* 5 Utah, 598, 18 Pac. 628; *Ritchie* v. *Richards,* 14 Utah, 345, 353, 47 Pac. 670; *State* v. *Jones,* 6 Wash. 452, 473, 23 L. R. A. 340, 34 Pac. 201; *Comstock* v. *Tracey* (C. C.), 46 Fed. 162, 171; *Mathis* v. *State,* 31 Fla. 291, 12 South. 681; *Home Telegraph Co.* v. *Nashville,* 118 Tenn. 1, 11 Ann. Cas. 824, 101 S. W. 770.

The cases cited may be distinguished in particulars, but the principle announced and adhered to is that the judicial department must keep within its sphere; that it must not arrogate to itself a superiority over the other two co-ordinate and coequal departments of the government, and erect itself into a tribunal to watch with jealous scrutiny the acts confided by the fundamental law to another department; in

short, the doctrine that the records of the legislative and executive departments of the government, when promulgated and authenticated and deposited with the legal custodian thereof, as provided in the constitution, import a verity which is conclusive upon the judicial department, and which record may not be impeached by any evidence *aliunde* such record is sturdily vindicated in them all.

Indeed, the courts that have taken a contrary view are generally receding from the position. In an Illinois case the court says: "We are not, however, prepared to say that a different rule might not have subserved the public interest equally well, leaving the legislature and the executive to guard the public interest in this regard, or to become responsible for its neglect." *People* v. *Starne,* 35 Ill. 121, reading at page 136, 85 Am. Dec. 348.

In *State* v. *Moore,* 37 Neb. 13, 55 N. W. 299, occurs the following: "Were the question a new one in this state, we would say that a bill duly deposited in the office of the Secretary of State, bearing the signatures of the presiding officers of the respective houses of the legislature and of the governor, imports absolute verity, and that the courts could not look beyond the signatures of these officers to ascertain what either house has done as to any items in said bill."

Mr. Sutherland, in the latest edition of his work on Statutory Construction, says: "It is no longer true that 'in a large majority of the states' the courts have held that the enrolled act may be impeached by a resort to the journals. A comparison will show that the courts are now about equally divided on the question. The current of judicial decision in the last ten years has been strongly against the right of the courts to go back of the enrolled act. Undoubtedly the decision of the supreme court of the United States in *Field* v. *Clark* has had much to do in creating and augmenting this current; but it may also be due to the greater simplicity, certainty, and reasonableness of the doctrine which holds the enrolled act to be conclusive. Many courts and judges, while feeling compelled to follow former decisions holding that the enrolled act may be impeached by the journals, have done so reluctantly, and have expressed doubts as to the validity of the doctrine, and in many cases, as will appear in the following sections, have qualified and restricted it in import-

ant particulars.'' 1 Sutherland on Statutory Construction, Lewis' 2d ed., p. 72.

If a properly enrolled and authenticated act of the legislature speaks verity, surely that same act, fortified by the approval of a majority of the qualified voters of the state and the proclamation of the governor, issued under a mandate of the constitution, declaring the act has become and is a law, is doubly strengthened as a record of unimpeachable character. Indeed, we feel that we could rest our decision of this question, without the support of analogous reason as applied to legislative acts, upon the plain language of the constitutional provision that any measure shall become law when approved by a majority vote and proclaimed as such by the governor. These are mandatory provisions of the constitution, and they attach no other condition to a referred measure becoming a law than approval by the electorate and the governor's proclamation. Other conditions could have been imposed, and their omission must have been intentional, and for the express purpose of preventing judicial interference in matters wholly legislative and executive. We agree with those courts that maintain that each department of government should in fact, as well as in theory, be independent of the other. Mandatory provisions of the constitution as to the making of laws are directed to the attention of the legislative department, and are binding on the conscience of those whose duty it is to observe them. This is likewise true of the executive and judicial departments within their sphere. Until the people, through their fundamental law, shall require the courts to supervise and direct the actions of the other departments in the process of making laws, we shall adhere to the theory of government that those departments are responsible to the people for any neglect of duty, and not to the courts, and that their records, when authenticated as required by the constitution and presented to this department, will import absolute verity, and conclude us from going beyond such records to impeach them.

As before stated in this opinion, the courts have power, and will not refuse to exercise it, if timely invoked, to command or restrain merely ministerial acts of the administrative officers. Consummated or completed acts we will not annul for reasons that might have possessed merit, if urged

at the proper time. In Prohibitory Amendment Cases, 24 Kan. 700, a case in some respects similar to this one, that court, speaking through Justice Brewer, afterward Associate Justice of the supreme court of the United States, at page 720, said: "After the contest was ended and the election over, the claim is for the first time made that after all there was nothing in fact before the people; that this whole canvass, excitement, and struggle was simply a stupendous farce, meaning nothing, accomplishing nothing. This is a government of the people, by the people, and for the people. This court has again and again recognized the doctrine, lying at the foundation of popular governments, that in elections the will of the majority controls, and that mere irregularities or informalities in the conduct of an election are impotent to thwart the expressed will of such majority. *Gilleland* v. *Schuyler,* 9 Kan. 569; *Morris* v. *Vanlaningham,* 11 Kan. 269; *Wildman* v. *Anderson,* 17 Kan. 344; *Jones* v. *Caldwell,* 21 Kan. 186; *Lewis* v. *Commrs. of Bourbon County,* 12 Kan. 186. In the opinion of the case last cited, we said, speaking of a case somewhat similar: 'Notwithstanding the silence of the statute and the omissions of the order, an election would doubtless be valid, where the people generally acquiesced in the manner and took part in the election.' We could not have used language more apt if we had been anticipating this very case. While estoppel may not technically bind either party to an election, yet where a mere defect of form exists, which may, if presented seasonably, be fully corrected, and is not suggested until after the election is over, there is eminent justice in applying the principles of estoppel, and holding that they who have gone to trial on the merits shall not, when beaten there, go back to an amendable defect in the preliminary proceedings.''

It appearing that the act in question is and was at the time appellant is charged with its violation, a valid exercise of legislative power, and a subsisting law under the police power of the state, it is the duty of the courts to administer it as such.

There appearing in the record no error prejudicial to any substantial right of the defendant, the judgment of the lower court is affirmed.